**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ignacio PINEDO–MONTOYA,**
**Defendant–Appellant.**

**No. 91–2095.**

United States Court of Appeals,
Tenth Circuit.

June 5, 1992.

---

Judith A. Patton, Asst. U.S. Atty., Las Cruces, N.M. (Don J. Svet, U.S. Atty., Albuquerque, N.M., with her on the brief), for plaintiff-appellee.

William D. Fry, Federal Public Defender, Las Cruces, N.M., for defendant-appellant.

McKAY, Chief Circuit Judge, HOLLOWAY, Circuit Judge, and BELOT, District Judge *.

BELOT, District Judge.

This is an appeal from a final judgment in a criminal case. Ignacio Pinedo–Montoya was indicted for one count of possession with intent to distribute less than fifty kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Pinedo's motion to suppress evidence was denied by the district court after an evidentiary hearing. Following the denial of his motion to suppress, Pinedo entered a plea of guilty and reserved the right to appeal the denial of his motion to suppress. After an evidentiary hearing to determine the net weight of the marijuana, Pinedo was sentenced to a term of 27 months imprisonment followed by three years of supervised release.

The issues presented in this appeal are whether the detention and search of Pinedo at the border checkpoint violated the Fourth Amendment and whether the court erred in determining the weight of the marijuana for sentencing purposes.

The facts developed at the suppression hearing indicated that Pinedo, accompanied by his brother, drove his 1980 Chevrolet Impala to a permanent border control checkpoint near Las Cruces, New Mexico, at approximately 12:45 a.m. on September 14, 1990. Border Patrol Agent Horacio Tijerina questioned Pinedo about his citizenship. Pinedo stated he was legally in the United States and showed Tijerina his amnesty document. In response to Tijerina's questions, Pinedo stated he was coming from El Paso and had been in Mexico

* Honorable Monti L. Belot, United States District Judge for the District of Kansas, sitting by designation.

for three days visiting his uncle. Pinedo showed Tijerina a California driver's license and his car, which he claimed to have recently purchased, displayed Texas tags. Pinedo said he was travelling to Tucson, where he resided. The questioning in the primary inspection area lasted for one to two minutes. Tijerina testified he was suspicious because Pinedo was nervous and turned his car off at the primary inspection area. Tijerina referred Pinedo to the secondary inspection area, approximately twenty feet from the primary inspection area.

At the secondary inspection area, Tijerina asked Pinedo if he could look inside the trunk. Pinedo consented and opened the trunk. No contraband was found. Tijerina then asked Pinedo if he could run a sniffer dog around the car, and Pinedo consented. Kevin Thatcher, the canine handler, proceeded to inspect the car. The dog alerted the agents to the presence of narcotics in the floorboard and gas tank. The agents dismantled the floorboard and gas tank and discovered a large quantity of marijuana. Pinedo was thereafter advised of his *Miranda* rights and gave a statement to the agents.

The district court found Pinedo exhibited nervousness, which by itself justified sending the car to the secondary inspection area. The court found the facts related by Pinedo during the initial encounter with Tijernia justified additional inquiry. Finally, the court found that the detention at the primary inspection area was brief, and when Pinedo reached the secondary inspection area, he voluntarily gave consent to search the trunk of his car and to run the sniffer dog around the car.

The standard of review is clear:

In reviewing a denial of a motion to suppress, the trial court's finding of fact must be accepted by this court unless clearly erroneous, *United States v. Cooper*, 733 F.2d 1360, 1364 (10th Cir.1984), with the evidence viewed in the light most favorable to the district court's finding. *United States v. Obregon*, 748 F.2d 1371, 1376 (10th Cir.1984).

*U.S. v. Benitez*, 899 F.2d 995, 997 (10th Cir.1990).

■ Pinedo argues Tijerina lacked the necessary reasonable suspicion to detain him at the border patrol checkpoint after ascertaining his citizenship status and asking him about any suspicious circumstances. Thus, Tijerina's request for consent to search the car was unlawful because it occurred while Pinedo was being illegally detained, and any product of the ensuing search is tainted by the constitutional violation and must be suppressed as the fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963).

The law governing stops and permissible questioning at permanent border checkpoints was restated in *U.S. v. Sanders*, 937 F.2d 1495 (10th Cir.1991):

A permanent border checkpoint need not be located on the border. *United States v. Martinez–Fuerte*, 428 U.S. 543, 553 [96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116] (1976). Stops and limited questioning may be asked in the absence of any individualized suspicion at reasonably located checkpoints. *Id.* at 562 [96 S.Ct. at 3085]. No individualized suspicion is necessary to stop, question and then selectively refer motorists to a secondary inspection checkpoint. *Id.* at 563 [96 S.Ct. at 3085]; *United States v. Rubio–Rivera*, 917 F.2d 1271, 1275 (10th Cir.1990). Border patrol agents have "virtually unlimited discretion to refer cars to the secondary inspection area." *INS v. Delgado*, 466 U.S. 210, 224 n. 6 [104 S.Ct. 1758, 1764 n. 6, 80 L.Ed.2d 247] (1984) (Powell, J., concurring); *United States v. Price*, 869 F.2d 801, 802–04 (5th Cir. 1989); *Jasinski v. Adams*, 781 F.2d 843, 847–848 n. 7 (11th Cir.1986); *United States v. Garcia*, 616 F.2d 210, 211–12 (5th Cir.1980) (*per curiam*); *United States v. Lopez*, 581 F.2d 1338, 1342–43 (9th Cir.1978) . . .

Questions may be asked in the absence of any individualized suspicion. *Martinez–Fuerte*, 428 U.S. at 562 [96 S.Ct. at 3085]. Border patrol agents may "question individuals regarding suspicious cir-

cumstances, in addition to citizenship matters, when those individuals are stopped at a permanent checkpoint." *United States v. Benitez,* 899 F.2d 995, 998 (10th Cir.1990). But any further detention must be based on the individual's consent or probable cause, *United States v. Espinosa,* 782 F.2d 888, 891 (10th Cir. 1986), or upon a valid investigative detention, *Espinosa,* 782 F.2d at 890; *see also Rubio–Rivera,* 917 F.2d at 1276–77 (validity of investigative detention decided on common-sense approach based on ordinary human experience). Detention and search beyond the routine customs inspection requires " 'reasonable suspicion' ... justified by a particularized and objective basis for suspecting the particular person of smuggling contraband." *United States v. Carreon,* 872 F.2d 1436, 1440 (10th Cir.1989) (citing *United States v. Montoya de Hernandez,* 473 U.S. 531, 541 [105 S.Ct. 3304, 3310, 87 L.Ed.2d 381] (1985)). Officers may not selectively search vehicles at a border unless they have probable cause or consent to justify the search. *United States v. Ortiz,* 422 U.S. 891, 896–97 [95 S.Ct. 2585, 2588–89, 45 L.Ed.2d 623] (1975).

937 F.2d at 1499.

The district court found the detention at the primary inspection area was brief. The court estimated the duration of the stop as somewhere between thirty seconds and two minutes. Pinedo was asked about his citizenship status and his travel plans. Whatever the standards may ultimately be for referral to secondary at a border check station, the record in this case indicates that Agent Tijerina had valid investigative reasons for referring Pinedo to the secondary inspection area. Tijerina testified his suspicions were aroused because Pinedo appeared nervous and did something abnormal by turning his car engine off. Tijerina considered Pinedo's travel story unusual. He told Tijerina he was coming back from a three-day visit to Mexico, yet he had no luggage in the car and told Tijerina that he had nothing in the trunk. Pinedo also told Tijerina he resided in Tucson, yet he had a California driver's license and a car with Texas license plates on it.

The district court correctly found that Agent Tijerina had reasonable suspicion to justify an investigative detention when he referred Pinedo to the secondary inspection area. Furthermore, application of the Fourth Amendment balance between the interests of the government and the privacy right of the individual at permanent border checkpoints falls on the government's side. *United States v. Martinez–Fuerte,* 428 U.S. at 562–63, 96 S.Ct. at 3085. Accordingly, we hold that referring Pinedo to the secondary inspection area for further questioning did not violate the Fourth Amendment.

The district court found Pinedo voluntarily consented to the search of his car in the secondary area. The evidence supports this finding, and Pinedo does not contest that he gave his consent, only that the consent was the product of an illegal detention. Once the dog alerted the agents to the presence of narcotics, the agents had probable cause to search the car.

The district court's denial of Pinedo's motion to suppress is AFFIRMED.

■ The second issue concerns the weight of the marijuana for sentencing purposes. Pinedo alleges the district court erred by including the moisture content of the marijuana in the calculation of the weight.

At the time the marijuana was seized on September 14, 1990, it was weighed initially at the Border Patrol office and measured at 101 pounds. It was then transported to the DEA office in Las Cruces. DEA Agent Dan Montoya weighed the marijuana on an official DEA scale and determined its weight to be approximately 96 pounds (approximately 43.6 kilograms). The marijuana was then stored in a bunker facility at the White Sands Missile Range.

Prior to sentencing, Pinedo asked that the marijuana be reweighed to determine its exact net weight. Maclovia Guardiola, an investigator from the public defender's office, testified she went to the DEA office on November 30, 1990, and reweighed the marijuana. The total weight was deter-

mined to be 79.9 pounds (approximately 36 kilograms).

The district court held an evidentiary hearing to determine the net weight of the marijuana for sentencing purposes. DEA Agent Montoya testified he used the official DEA scale to weigh the marijuana on September 14, 1990, and the marijuana was moist. Montoya testified the marijuana had to be moist in order for Pinedo to transport it in the manner he did. Montoya added that weight loss is common when marijuana dries out and the amount of weight loss in this case was not unusual. Albert Saibini, a bulk custodian at the White Sands Missile Range, described the conditions under which the marijuana was stored and testified dehydration was a common phenomenon.

The district court found the marijuana was reasonably weighed and estimated at the time it was seized, and accepted the government's weight of 96 pounds. The court was satisfied that dehydration occurred and accounted for the weight loss.

 The district court's factual findings concerning the amount of marijuana involved in a defendant's conduct are reviewed for clear error. *United States v. Padilla,* 947 F.2d 893, 894 (10th Cir.1991). Questions of law concerning interpretation of the Sentencing Guidelines are subject to *de novo* review. *United States v. Gardiner,* 931 F.2d 33, 34 (10th Cir.1991).

Pinedo argues that even if the government weight was accurate, the district court erred by calculating the appropriate base level for his offense on the basis of the weight of damp marijuana. His argument is that the statutory penalty provisions for larger quantities of marijuana, 21 U.S.C. §§ 841(b)(1)(A)(vii) and 841(b)(1)(B)(vii), refer to "a mixture or substance containing a detectable amount of marijuana" while the penalty provision for quantities of less than fifty kilograms of marijuana, 21 U.S.C. § 841(b)(1)(D) omits the "mixture or substance" language. Thus, although the guidelines themselves direct the court to consider "the entire weight of any mixture or substance containing a detectable amount of the con-

trolled substance", application of the guideline would be an improper enlargement of the statute.

In *U.S. v. Garcia,* 925 F.2d 170 (7th Cir.1991), the court considered the issue of whether to include the moisture content in determining the weight of the marijuana for sentencing purposes and rejected the defendant's argument. In the court's view, the guidelines dictated a simple and straightforward approach to drug sentencing: Unless otherwise specified, the weight to be considered is "the entire weight of any mixture or substance containing a detectable amount of (marijuana)". *Id.* at 172. Because marijuana was not otherwise specified, the entire weight, including any existing moisture content, is relevant for sentencing purposes. *Id.*

Additionally, the court believed water is arguably included within the statutory definition of marijuana. 21 U.S.C. § 802(16). While the court acknowledged that the moisture content of the marijuana may affect its marketability, the court noted its interpretation had the result of minimizing judicial concerns about when the marijuana was harvested and how it was dried, processed and stored. *Id.* at 172–73.

We believe the reasons articulated by the *Garcia* court have force and should guide our decision. Additionally, punishing an offender based on the weight of the damp marijuana seized from his car is consistent with the intention of Congress. Congress intended to punish drug traffickers based on the total quantity of what is distributed, rather than the pure drug involved. *Chapman v. United States,* —— U.S. ——, 111 S.Ct. 750, 112 L.Ed.2d 770 (1991). It did not intend to punish persons who trafficked in smaller amounts of drugs less severely, but rather to punish drug traffickers according to the weight of drugs "in whatever form they were found." *Id.*

In this case, Pinedo, not the government, chose the method of transporting the marijuana in a deliberate effort to conceal his criminal activity. There was no evidence that the marijuana would have been marketed in any condition other than as it was seized. In our view, omission of the phrase

"mixture or substance" in § 841(b)(1)(D) does not signify a congressional intent to require the sentence to be based on the dry weight of the marijuana.

The district court properly considered the moisture content in the calculation of the weight of the marijuana for sentencing purposes. The factual findings of the district court upon which sentence was imposed are AFFIRMED.