**UNITED STATES of America, Plaintiff,**

v.

**Martin Steve CHAVIRA, Defendant.**

**Crim. No. 92–313 JP.**

United States District Court,
D. New Mexico.

Jan. 29, 1993.

---

Jose R. Coronado, Las Cruces, NM, Tova Indritz, Federal Public Defender's Office, Albuquerque, NM, Francisco F. Macias, El Paso, TX, for defendant.

James D. Tierney, U.S. Attorney's Office, D. of N.M., Albuquerque, NM, for U.S.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

The subject of this memorandum opinion and order is defendant's motion, filed August 5, 1992, to suppress. At a December 2, 1992 hearing, I requested supplemental memoranda from both the plaintiff and the defendant discussing whether a Border Patrol agent working a primary inspection area at a permanent border checkpoint may, after asking all questions the agent intended to ask about citizenship and without any suspicious circumstances whatsoever, continue to detain an individual for additional questioning on matters unrelated to citizenship. After careful consideration of the facts and law, I have determined that any additional detention for questioning on matters unrelated to immigration status must be based on at least some "suspicious circumstances." Therefore, under the facts of this case, defendant's motion to suppress should be granted.

On June 7, 1992, United States Border Patrol Agent Robles was in the primary inspection area at the permanent border checkpoint on Highway 54 south of Alamogordo, New Mexico. At 8:18 a.m., defendant, who was alone and driving a brown Ford Maverick, entered the primary inspection area of the checkpoint. No other vehicles were present at the checkpoint when defendant arrived and there was no evidence that other vehicles entered the checkpoint while defendant's vehicle was in the primary inspection lane.

Agent Robles asked defendant, in English, whether he was a United States citizen and defendant responded, in English, that he was. Agent Robles testified that he had absolutely no suspicion surrounding defendant at this point. Agent Robles expressed no reason to doubt the truth of defendant's answer. However, Agent Robles proceeded to ask defendant where he was going to which defendant responded that he was en route to Oklahoma to buy some vehicles. At first, Agent Robles testified that he could not state a reason why he asked the defendant this second question. After further questioning by the Assistant United States attorney, Agent Robles adopted the attorney's suggestion that he asked the second question in order to have a chance to listen further to defendant's ability to speak English. I believe the agent's initial answer—that he really did not know why he asked defendant's destination—is the more credible testimony and I find as a fact that the agent truly did not know why he asked the question. Defendant's response that he was going to Oklahoma to buy vehicles aroused Agent Robles' suspicion since defendant's car did not appear to be heavily loaded with a tow bar, as was normal, in Agent Robles' experience, for travelers going to another state to purchase vehicles.

Thus, after the second question and answer, which resulted in an additional detention of only a few seconds, Agent Robles'

suspicions were aroused and he proceeded with the interrogation. After a few more questions, Agent Robles obtained defendant's consent to have a dog trained to detect narcotics sniff his vehicle and Agent Robles referred defendant to the secondary inspection area. Marijuana and cocaine were subsequently found in defendant's car.

■ Although the government has presented a strong argument that, because of the brevity of the detention, the agent acted reasonably and not in violation of the Fourth Amendment, I conclude that after asking all questions intended to be asked about citizenship and in the absence of any suspicious circumstances whatsoever, an agent at the primary inspection area of a permanent checkpoint may not detain an individual further, even very briefly, to ask an additional question which is unrelated to immigration status. Although the Tenth Circuit law on the level of suspicion needed at a permanent checkpoint in order to conduct further investigation is rather unclear, the facts in each of the recent checkpoint cases indicate that the agent observed suspicious circumstances before proceeding to ask questions unrelated to immigration matters.

Beginning with *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir.1986), the Tenth Circuit cited *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) for the following proposition:

> The border agent may question the driver and passengers about their citizenship and immigration status, and ask them to explain suspicious circumstances. Any further detention must be based on consent or probable cause.

In *Espinosa*, the agent's questioning of defendant and his passenger about their citizenship and immigration status lasted no more than two minutes, during which time, the agent noticed that they hesitated and looked at each other before answering questions. Moreover, defendant's car had only a temporary Florida license plate in the back window. Thus, the agent's suspicions were aroused during the initial detention when citizenship and immigration status were being investigated. The further detention was justified by the suspicious circumstances which came to the agent's attention during the legal initial detention.

> The Fourth Amendment does not require police officers to close their eyes to suspicious circumstances. Agent Teuber's inquiry about drugs accounted for but a moment of defendant's brief detention and was based upon specific and articulable facts and rational inferences.

*United States v. Espinosa*, 782 F.2d at 891. Thus, because a "brief stop of a suspicious individual," *Hayes v. Florida*, 470 U.S. 811, 817, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985), does not violate the Fourth Amendment, *Espinosa* held that "defendant's stop and initial brief detention at the checkpoint were proper and lawful." *United States v. Espinosa*, 782 F.2d at 891.

*United States v. Johnson*, 895 F.2d 693, 696 (10th Cir.1990) reaffirmed the holding in *Espinosa* that "[b]order patrol agents may question the occupants of a vehicle about their citizenship and to explain suspicious circumstances." In *Johnson*, the agent testified that when defendant and his passenger pulled into the checkpoint at 11:35 p.m. in a 1987 Fiero, he questioned them about their citizenship and while they were answering, the agent detected the smell of alcohol. The agent also testified that he believed the car may have been stolen since the occupants' appearances were not consistent with the vehicle. Thus, during the initial questioning concerning citizenship, the agent noticed suspicious circumstances which lead him to ask further questions. Since "the Fourth Amendment does not requires police officers to close their eyes to suspicious circumstances," *United States v. Johnson*, 895 F.2d at 696 (quoting *United States v. Espinosa*, 782 F.2d at 891), the court held that the further detention of the defendant was constitutional.

In *United States v. Benitez*, 899 F.2d 995 (10th Cir.1990), when the defendant and his wife pulled into the permanent checkpoint, a border patrol agent ques-

tioned them about their citizenship and the defendant indicated he was a United States citizen and the wife presented an alien registration card. The agent testified that defendant "demonstrated several indicia of nervousness. [He] was gripping the steering wheel tightly, his knuckles were white, his Adam's apple was moving up and down, he stuttered when he answered [the agent's] questions, and he was sweating although it was fairly cool that day." *Benitez*, 899 F.2d at 998. The court held that defendant's nervousness "gave rise to reasonable suspicion which justified ... further questioning and request for consent to search." *Id.* The Tenth Circuit upheld the District Court's decision that, based on defendant's nervousness, the agent had reasonable suspicion to question defendant further and to request permission to search.

> The Border Patrol maintains permanent checkpoints on important roads leading away from the border. At these checkpoints, a vehicle may be stopped and its occupants may be questioned briefly, even if there is no reason to believe the particular vehicle contains illegal aliens. (cites omitted). The occupants of the vehicle may be required to answer a few questions regarding their citizenship or to produce documentation evidencing a right to be in the United States. *Martinez–Fuerte*, 428 U.S. at 558 [96 S.Ct. at 3083] (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 880 [95 S.Ct. 2574, 2580, 45 L.Ed.2d 607] (1975)). Additionally, the Border Patrol may ask the driver and passengers to explain suspicious circumstances. *United States v. Espinosa*, 782 F.2d 888, 896 (10th Cir. 1986). In a case decided this term we have reaffirmed the authority of the Border Patrol to question individuals regarding suspicious circumstances, in addition to citizenship matters, when those individuals are stopped at a permanent checkpoint. *United States v. Johnson*, 895 F.2d 693 (10th Cir.1990).

*United States v. Benitez*, 899 F.2d at 997.

█ Thus, *Benitez* clearly explains that an agent may only detain an individual at a checkpoint for questioning beyond matters related to immigration status if the agent can base the further detention on suspicious circumstances.

In *United States v. Rubio–Rivera*, 917 F.2d 1271 (10th Cir.1990), the defendant, who was stopped at a permanent border checkpoint, argued that once the agent at the primary inspection area was satisfied that his immigration card was valid, defendant should have been released rather than required to proceed to the secondary checkpoint. However, before the agent continued on to a second question unrelated to citizenship, the agent had already made certain observations that aroused his suspicion. The agent testified that when the defendant handed the agent a temporary resident alien card, the defendant failed to make eye contact with the agent and his hand was shaking. The agent then began to further interrogate the defendant and the agent's suspicions increased.

> [N]o individualized suspicion is necessary to stop, question, and then selectively refer motorists to a secondary immigration checkpoint. *United States v. Martinez–Fuerte*, 428 U.S. 543, 562–563 [96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116] (1976). Border patrol agents have "virtually unlimited discretion to refer cars to the secondary inspection area." *INS v. Delgado*, 466 U.S. 210, 221, 224 n. 6 [104 S.Ct. 1758, 1765, 1766 n. 6, 80 L.Ed.2d 247] (1984) (Powell, J. concurring) ...

The rationale of *Martinez–Fuerte* is grounded in the government's legitimate concerns about citizenship and immigration status of those entering into the United States and the detection of unlawful entry. (cites omitted). Notwithstanding, we have held that border patrol agents may "question individuals regarding suspicious circumstances in addition to citizenship matters, when those individuals are stopped at a permanent checkpoint." *United States v. Benitez*, 899 F.2d 995, 998 (10th Cir.1990). In *United States v. Espinosa*, 782 F.2d 888 (10th Cir.1986), we stated:

> The border agent may question the driver and passengers about their citizenship and immigration status, and

ask them to explain suspicious circumstances. Any further detention must be based on consent or probable cause. *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–882 [95 S.Ct. 2574, 2580, 45 L.Ed.2d 607] (1975).

*Id.* at 891. Thus, even when the questions asked at the primary checkpoint allay all concerns about citizenship and immigration status, an agent still may direct a vehicle to a secondary checkpoint and further question the occupants on the basis of reasonable suspicion that a crime has been committed. *United States v. Johnson*, 895 F.2d 693, 698 (10th Cir.1990). Border patrol agents are not required to ignore suspicious circumstances, even if such circumstances may not be pertinent to citizenship and immigration status. *Johnson*, 895 F.2d at 696; *Espinosa*, 782 F.2d at 891.... Merely because the agent was satisfied that defendant had a valid immigration card, however, does not mean that the agent required reasonable suspicion to have defendant proceed to the secondary checkpoint....

*United States v. Rubio–Rivera*, 917 F.2d at 1276.

Here begins the confusion. As outlined above, the discussion of the requirements of the Fourth Amendment at a permanent border checkpoint in *Rubio–Rivera* seems to state four different and conflicting legal conclusions: (1) no individualized suspicion is necessary to detain an individual at a checkpoint and refer that individual to the secondary inspection area; (2) agents may question individuals based on "suspicious circumstances"; (3) an agent must have "reasonable suspicion" to refer an individual to the secondary inspection area; and (4)

reasonable suspicion is not required to have the defendant proceed to the secondary checkpoint. However, given the rationale behind the *Martinez–Fuerte* case (as noted above in *Rubio–Rivera*)[1], and previous Tenth Circuit law which consistently held that suspicious circumstances are necessary in order to detain an individual for questioning beyond immigration matters, and finally, given the facts of *Rubio–Rivera* in which the agent noticed the defendant's nervousness while the agent was inquiring about the defendant's citizenship, I conclude that *Rubio–Rivera* stands for the proposition that the officer at least must be able to articulate some "suspicious circumstances" in order to detain an individual once all citizenship matters have been resolved.

In *United States v. Sanders*, 937 F.2d 1495 (10th Cir.1991), *cert. denied* — U.S. ——, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992), the agent working the primary inspection area at a permanent checkpoint noticed, before he began to interrogate the defendant, that the defendant's pickup truck had two black tool boxes located in the bed of the pickup. The agent considered this to be suspicious since, in his experience, he had never before seen a pickup containing more than one of this type of tool box and because the agent knew through his experience that this type of tool box had been used to secrete drugs. Based on the significance of the tool boxes, the fact that it was late at night, and the defendant's unusually detailed answers to his questions, combined with the fact that two vehicles and several semitrailers were waiting in line behind defendant's pickup at the primary inspection area, the agent decided to ask the defendant to go to the

---

1. *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) answered the question of whether the routine activity at checkpoints violated the Fourth Amendment. Weighing the government's substantial interest in controlling the flow of illegal aliens into the interior of the country against the minimal intrusion on individual motorists, the Court held that at permanent checkpoints, the stopping of vehicles and questioning of individuals on matters related to immigration status is constitutional despite the absence of individualized suspicion. In regards to referring motorists to the secondary inspection area in order to continue the investigation for aliens illegally in the United States, the Court noted, "As the intrusion here is sufficiently minimal that no particularized reason need exist to justify it, we think it follows that the Border Patrol officers must have wide discretion in selecting the motorists to be diverted for the brief questioning involved." *Martinez–Fuerte*, 428 U.S. at 563–564, 96 S.Ct. at 3085.

secondary inspection area for further questions.

The District Court found that there was no reasonable articulable suspicion to refer defendant to the secondary inspection area and suppressed the discovered contraband. The Tenth Circuit reversed. The law which the *Sanders* court outlines follows in the footsteps of *Rubio–Rivera* and adds confusion.

Stops and limited questioning may be asked in the absence of any individualized suspicion at reasonably located checkpoints. *United States v. Martinez–Fuerte*, 428 U.S. 543, 562 [96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116] (1976). No individualized suspicion is necessary to stop, question and then selectively refer motorists to a secondary inspection checkpoint. *Id.* at 563 [96 S.Ct. at 3085]; *United States v. Rubio–Rivera*, 917 F.2d 1271, 1275 (10th Cir.1990). Border patrol agents have "virtually unlimited discretion to refer cars to the secondary inspection area." *INS v. Delgado*, 466 U.S. 210, 224 n. 6 [104 S.Ct. 1758, 1767 n. 6, 80 L.Ed.2d 247] (1984) (Powell, J., concurring) (other cites omitted).

We next look to the law defining permissible questioning at permanent border checkpoints. Questions may be asked in the absence of any individualized suspicion. *Martinez–Fuerte*, 428 U.S. at 562 [96 S.Ct. at 3085]. Border patrol agents may question individuals regarding suspicious circumstances, in addition to citizenship matters, when those individuals are stopped at a permanent checkpoint. *United States v. Benitez*, 899 F.2d 995, 998 (10th Cir.1990). But any further detention must be based on the individual's consent or probable cause, *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir.1986), or upon a valid investigative detention. *Espinosa*, 782 F.2d at 890; *see also Rubio–Rivera*, 917 F.2d at 1276–1277 (validity of investigative detention decided on common-sense approach based on ordinary human experience). Detention and search beyond the routine customs inspection requires reasonable suspicion ... justified by a particularized and objective basis

for suspecting the particular person of smuggling contraband. (cites omitted). *United States v. Sanders*, 937 F.2d at 1499. Thus, on the one hand, *Sanders* permits questioning without any individualized suspicion and on the other hand, *Sanders* requires suspicious circumstances in order to justify questioning beyond citizenship matters. The *Sanders* court goes on to state that "[a]lthough the law requires no suspicious circumstances to refer a motorist to a secondary inspection area at a permanent border checkpoint, we note the border patrol agents here had suspicions because Defendant was travelling in the middle of the night, was carrying two tool boxes, and because of the way Defendant answered questions." *Id.*

*Sanders* further found that although the agents did not have probable cause or reasonable suspicion to detain defendant when they directed him to secondary, the detention was not in violation of the Fourth Amendment since it occurred at a permanent border checkpoint where "[b]order patrol officers have wide discretion in selecting which motorists to divert to a secondary inspection area for brief questioning." *Id.* at 1500 (citing *Martinez–Fuerte*, 428 U.S. at 563, 96 S.Ct. at 3085).

Detention and questioning at borders based only on suspicious circumstances are approved as consistent with the accepted government policy of ensuring that only United States citizens and authorized aliens lawfully enter this country, and that no one is permitted to secrete contraband through the border. To further this policy, routine questions at permanent border checkpoints are therefore not required to meet the more rigid Fourth Amendment requirements of probable cause or reasonable suspicion. Border agents may ask a driver and passengers to explain suspicious circumstances. *Espinosa*, 782 F.2d at 891. The Fourth Amendment does not require police offices to close their eyes to suspicious circumstances. *Id.*

In construing what "suspicious circumstances" means, courts should recognized there is no single or narrow defini-

tion available to answer all scenarios. Accordingly, some deference is properly given to border patrol agents who, as law enforcement officers, are specifically trained to look for indicia of crime, with an emphasis on immigration and customs laws. So long as their interrogation bears a reasonable relationship to their unique duties, the judiciary is properly reluctant to interfere, and a reviewing court should only determine whether the suspicious circumstances as perceived by the border patrol agents are supported by the facts.

*Sanders*, 937 F.2d at 1500. Although plaintiff refers to *Sanders* as "instructive both in its similarity of the facts and in the similarity of legal issues it shares with the case before this court," Supplemental Response to Defendant's Motion to Suppress at 13, I find *Sanders* to be significantly different from this case since, as the court in *Sanders* noted, the officer articulated suspicious circumstances which lead him to detain and question the defendant beyond immigration matters.

Most recently, in *United States v. Preciado*, 966 F.2d 596 (10th Cir.1992), the Tenth Circuit again addressed a defendant's argument that once the agent ascertained his immigration card was valid, the defendant should have been permitted to proceed without further delay. The agent testified, however, that the defendant's voice was cracking and he was fidgeting while responding to the agent's questions.

Application of the Fourth Amendment under the facts of this case requires this court to balance between the government's interest in monitoring its borders with the level of intrusiveness occasioned by the stop. *Michigan v. Sitz*, 496 U.S. 444 [110 S.Ct. 2481, 110 L.Ed.2d 412]

(1990). This court has held that border patrol agents may question individuals regarding suspicious circumstances, in addition to citizenship matters, when those individuals are stopped at permanent checkpoints. *United States v. Benitez*, 899 F.2d 995, 998 (10th Cir.1990). Even when the questions asked at the primary inspection area satisfy all concerns about a person's citizenship or immigration status, an agent may still direct a vehicle to a secondary inspection area and further question the occupants on the basis of reasonable suspicion that a crime has been committed. *United States v. Johnson*, 895 F.2d 693, 696 (10th Cir.1990).

*United States v. Preciado*, 966 F.2d at 598.

The *Preciado* court does not detail exactly when the officer first noticed defendant's nervousness; thus, *Preciado* does not address the specific question at issue here, that is, whether an agent may ask a second question when he has absolutely no suspicion or articulable basis to do so. The *Preciado* court simply held that the district court did not err in finding reasonable suspicion to refer the defendant to secondary based on his nervousness. It is noteworthy that *Preciado* is void of any language to the effect that an officer can refer a vehicle to the secondary inspection area based on no suspicion at all. Instead, *Preciado* clearly states that an agent may question an individual at the checkpoint based on "suspicious circumstances." [2]

█ In this case, Agent Robles stated that when he first questioned defendant on a matter that did not pertain to citizenship, he had absolutely no suspicion about defendant. In contrast to all the Tenth Circuit

---

**2.** Plaintiff refers to another recent Tenth Circuit case, *United States v. Pinedo–Montoya*, 966 F.2d 591 (10th Cir.1992). In *Pinedo–Montoya*, the defendant argued that the agent lacked the necessary reasonable suspicion to detain him at the border patrol checkpoint after ascertaining his citizenship status and asking him about any suspicious circumstances. Thus, the defendant did not contest that suspicious circumstances existed. Instead, the defendant argued that the agent's concerns should have been allayed in the primary inspection area and thus, the agent did

not have reasonable suspicion to refer him to the secondary area. The agent testified that he was suspicious because the defendant was nervous and he turned off his engine at the primary inspection area. The court does not explain whether the defendant became nervous and turned off his engine before or after the agent began to ask questions beyond the scope of immigration concerns. Thus, *Pinedo–Montoya* is not helpful in determining the question which is before me.

cases discussed above, in each of which the agent justified the further questioning of the defendant by articulating some facts which aroused his suspicion before he began to ask questions unrelated to immigration concerns, agent Robles did not have suspicious circumstances to support any further detention of defendant. I conclude that it is unreasonable for an officer, who completely lacks any indicia of suspicion, to further detain an individual at a permanent checkpoint in order to ask questions beyond citizenship matters.

The detention of individuals at the permanent border checkpoints must be subject to Fourth Amendment limitations. I am mindful that the additional detention of defendant was very brief and that the government has a strong interest in controlling the flow of contraband across our borders. However, if an agent is permitted to ask one additional question without any articulable basis for doing so, may an agent ask two, three, four or more additional questions? At what point does the continued questioning in the absence of suspicious circumstances become unreasonable and in violation of the Fourth Amendment? I believe that the best solution is to preclude any additional detention unless it is based on at least some suspicious circumstances. I conclude, therefore, that once agent Robles began to question defendant about matters unrelated to immigration status without any suspicion whatsoever, the detention of defendant became unconstitutional at that precise moment. Since the illegal detention lead to the subsequent search of defendant's car, all evidence found as a result of that search must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484–488, 83 S.Ct. 407, 414–17, 9 L.Ed.2d 441 (1963).

IT IS THEREFORE ORDERED that defendant's motion to suppress is GRANTED.