UNITED STATES of America, Plaintiff,

v.

**Robert LAMBERT, Defendant.**

No. 92–10101–01.

United States District Court,
D. Kansas.

Sept. 22, 1993.

---

1. There is no claim of inadequate or untimely service of process by defendant.

Lanny D. Welch, Asst. U.S. Atty., Wichita, KS, for plaintiff.

Daniel E. Monnat, Monnat & Spurrier, Wichita, KS, and Mayer Kanter, Sioux City, IA, for defendant.

## MEMORANDUM AND ORDER

THEIS, Senior District Judge.

This matter is before the court on defendant's motion to suppress, Doc. 25, and defendant's motion for discovery of detector dog information, Doc. 38. The court held hearings on July 16, 1993 and August 20, 1993. At the conclusion of the July 16 hearing, the court granted in part and denied in part the motion for discovery of detector dog information. For the reasons stated herein, the motion to suppress shall be denied.

This case arises from the detention of the defendant's suitcase at the Wichita Mid–Continent Airport on December 11, 1992. DEA agents approached defendant Lambert in the airport parking lot shortly after 5:30 p.m. and questioned him for approximately 15–20 minutes. Lambert's suitcase was taken from him at around 6:00 p.m. The suitcase was sniffed by two trained narcotics detection dogs, the first at approximately 6:20 p.m., and the second at approximately 7:35 p.m. Both dogs alerted on the defendant's suitcase. A search warrant was then obtained. The suitcase was searched, and quantities of marijuana, cocaine, and methamphetamine were discovered.

Defendant Lambert makes the following arguments: (1) he was subjected to a warrantless seizure by law enforcement officers in the parking lot of the Wichita Mid–Continent Airport on December 11, 1992; (2) the defendant and the suitcase were subjected to seizure when the agents physically seized the suitcase or informed the defendant they were doing so; (3) at the time of the seizure, the officers lacked reasonable suspicion based on articulable facts, which is a prerequisite for an investigative detention; (4) if the agents had reasonable suspicion, the conduct of the agents exceeded the scope of an investigative detention by detaining the suitcase for an unreasonably long period of time, by failing to inform defendant of the place where they were taking the suitcase, the length of time he might be dispossessed of the suitcase, and what arrangements would be made for the return of the suitcase; (5) the evidence obtained pursuant to the warrant is tainted by the preceding illegal detention; (6) any statements were not knowing and voluntary; (7) the government's conduct was so egregious as to constitute a denial of due process; (8) searches and seizures were conducted in violation of the defendant's rights under the First, Fourth, Sixth, and Fourteenth Amendments; and (9) all evidence is the fruit of an unconstitutional search and must be suppressed.

In his brief in support of the motion to suppress, defendant makes the following ar-

guments: (1) Lambert was subjected to a fourth amendment seizure in the parking lot at the airport prior to the time the agent informed defendant his suitcase was going to be detained; (2) even if the encounter in the parking lot was consensual prior to the seizure, the seizure was at least an investigative detention requiring reasonable suspicion of criminal activity; (3) the agents lacked reasonable suspicion when they seized the suitcase—(a) he did not use an alias nor engage in evasive behavior; (b) "nervousness" is entitled to little significance in assessing reasonable suspicion; (c) paying for a ticket in cash and boarding from a city other than one's city of residence are heavily discounted in determining reasonable suspicion; (4) assuming reasonable suspicion existed, the seizure of the suitcase, transportation to the DEA office several miles away, and detention for 95 minutes prior to exposing the suitcase to a drug detection dog, and failure to inform defendant how he could reclaim the suitcase, exceeded the scope of a valid investigative detention; and (5) the subsequent search warrant does not rectify the prior illegal seizure of the suitcase.

The testimony presented at the suppression hearing reveals the following. Jerry Joyce is an Airport Safety Officer and a member of the Drug Enforcement Administration (DEA) Task Force. On December 11, 1992, Joyce received a phone call from DEA Task Force Officer Jim Hughes of the Dallas/Fort Worth Airport. Hughes informed Joyce that a person by the name of Robert Lambert had purchased a cash, one way ticket on American Airlines from Los Angeles to Wichita. The ticket was purchased shortly before flight time. Lambert had checked one piece of luggage, tag number 176056. Hughes gave Joyce the flight number, the time of arrival, and the baggage claim number. Joyce received no description of Lambert or the suitcase. Joyce testified that the cash purchase of a one way ticket shortly before flight time is a method sometimes used by drug traffickers. Knowing that Los Angeles is a source city for drugs and coupled with the information regarding the ticket purchase, Joyce, DEA Agent Craig Stansberry and DEA Task Force Agent M.W. McDonald proceeded to the airport to

locate the suitcase. The agents located the suitcase in the non-public area behind the baggage carousel. Joyce noticed a paper name tag on the suitcase bearing Lambert's name and address. The suitcase was a blue, hardsided Samsonite bag. The agents proceeded to the public area to see who would retrieve the suitcase.

Joyce testified that while the agents were waiting for the suitcase to be picked up, they viewed the people waiting in the baggage claim area. Joyce saw a man (later identified as Robert Lambert) who appeared to be extremely nervous. The man was repeatedly looking at the exits, looking around and over his shoulder, rather than looking at the bags on the belt. Joyce saw the bag in question come out onto the baggage claim belt. Another blue hardsided suitcase was claimed by a family that did not look suspicious. Lambert retrieved his bag from the belt and left the airport very quickly. Joyce stated that Lambert almost ran out to the parking lot. Agents Joyce and Stansberry ran behind him and caught up with Lambert in the short term parking lot. Agent McDonald remained near the terminal building. When the agents approached him, Lambert was standing next to a Ford Taurus with his keys in his hand. The time was approximately 5:35 or 5:40 p.m. The agents identified themselves and asked to speak to Lambert.

Joyce testified that the agents wanted to verify the information previously received and to question Lambert about the nature of his travel. The agents asked Lambert whether he had just flown in and asked to see Lambert's ticket. Lambert showed the agents his ticket, which reflected that it was a one way ticket from Los Angeles. The agents returned the ticket to Lambert. The agents also asked to see Lambert's drivers license. When asked the nature of his travel, Lambert stated he was in Wichita on business. Lambert stated that he was from Spirit Lake, Iowa and produced an Iowa drivers license and a business card. Agent Stansberry took the license. The Ford Taurus bore Iowa license plates.

When asked regarding the nature of his trip to Los Angeles, Lambert stated that he

went to sell a car, a 1985 Trans Am. Lambert stated that he had driven from Iowa to Wichita and had flown from Wichita to Los Angeles. Joyce thought it was suspicious that Lambert would have driven from Iowa to Wichita in order to fly to Los Angeles, when Lambert could have flown from several airports in Iowa or Kansas City. Joyce also thought it suspicious to fly from Wichita since it is so expensive to fly from Wichita. Joyce was also curious as to why Lambert had not driven the Trans Am to Los Angeles in order to sell it. When asked if he was carrying drugs or large sums of money, Lambert stated that he had not sold the car, but had gone to Los Angeles to firm up the deal.

Lambert stated that he had flown out of Wichita because it was cheaper. Joyce testified that in his experience and from his knowledge, fares from Kansas City and Oklahoma City are much cheaper than fares from Wichita. When asked how long he would be staying in Wichita, Lambert stated that he was leaving immediately. Joyce testified that he had gotten the impression that Lambert was planning on staying in Wichita, based on Lambert's earlier statement that he (Lambert) was in Wichita on business.

Lambert had retrieved a briefcase from his car at some point in time during the discussion, which he had left open on the car. Joyce asked for permission to look in Lambert's bags. Lambert pointed to the open briefcase and allowed Joyce to look in it. Lambert inquired as to whether he had a choice regarding a search of the suitcase. Lambert was informed that he did not have to consent to a search. Lambert refused to consent to a search of the suitcase. Agent Stansberry then stated that they would seize the suitcase. Stansberry took the suitcase and gave Lambert a receipt. Included on the receipt was the phone number of the DEA office. The agents asked Agent McDonald to try to get a narcotics detection dog to the scene. It was approximately 6:00 p.m. when the agents decided to detain the suitcase. The agents told Lambert that they were going to get a dog to sniff the bag and that Lambert could stay if he wished. Lam-

bert stated that he wanted to leave and he was allowed to leave.

Lambert's suitcase was taken to the Airport Safety Office in the terminal building while the agents waited for a narcotics detection dog to be summoned. Agent McDonald called the DEA office, asking an agent there to call the Wichita Police Office to arrange for a dog. Detective James Whittredge and his dog "Homer" were not available. Officer Bradley Agnew responded with his dog "Rocco" at approximately 6:15 to 6:20 p.m. The agents had previously laid out several bags for the dog to check. Rocco alerted on Lambert's bag. Joyce testified that the agents believed there was some problem with Rocco's certification as a narcotics detection dog—that perhaps Rocco was certified to detect marijuana and not hard drugs, or vice versa. The agents decided that they would summon Detective Whittredge and Homer. The agents left the airport and went to the DEA office. Whittredge arrived with Homer at approximately 7:30 p.m. Lambert's suitcase had been hidden in some bushes in the atrium area of the building lobby. Homer alerted on Lambert's suitcase.

An affidavit was prepared and a search warrant was obtained later that evening from U.S. District Judge Belot. A search of the suitcase revealed packages wrapped as Christmas presents which contained marijuana, cocaine and methamphetamine. Also contained in the packages were baggies containing baby powder and pepper, used to mask the odor of drugs. The search of the suitcase occurred near midnight.

On cross examination, Joyce admitted that no arrangements had been made beforehand to have a narcotics detection dog at the airport. Joyce also admitted that he did not know where Spirit Lake, Iowa is and he did not know specific airfares. Joyce reiterated that he noticed that Lambert was nervous prior to connecting him with the suitcase.

DEA Special Agent Craig Stansberry also testified at the hearing. Joyce asked Stansberry to participate in the investigation at the airport. They arrived at the airport at approximately 4:30 to 5:00 p.m. Joyce had only a baggage claim number and the name Robert Lambert. With the assistance of an

Airport Safety Officer, the agents found the correct claim number on the handle of a suitcase as the luggage was being offloaded from the plane. One of the officers verified that the name tag on the suitcase bore the name Robert Lambert. Stansberry also testified that they then went to the public area to observe who would pick up the bag. Stansberry did not see Lambert until Lambert walked past Stansberry to retrieve the suitcase from the belt. Stansberry testified that Lambert left the airport quite rapidly. Lambert stopped in the parking lot nearest the terminal building at a dark Ford Taurus. The agents, who were not in uniform, approached the car and identified themselves. Stansberry's testimony generally corroborated Joyce's testimony regarding the subject matter of the questioning and the agents' suspicions. After Stansberry decided to seize the bag, Lambert was told he was free to stay or go. Stansberry prepared a receipt for the bag and stated that the bag would be returned to Lambert if their suspicions were dispelled. At this point, Stansberry summoned an Airport Safety Officer to check for any outstanding warrants. Stansberry testified that he gave the airport officer Lambert's license to check for any outstanding warrants. When the check disclosed no outstanding warrants, Stansberry gave Lambert the receipt, returned Lambert's license to him, and told Lambert he was free to go.

Stansberry stated that Joyce checked with the Wichita Police regarding a narcotics detection dog. The dog arrived at the airport with Officer Agnew. The agents had taken the suitcase behind the American Airlines ticket counter where it had been placed with other luggage. According to Officer Agnew, the dog alerted on Lambert's bag. The agents had some question regarding whether Agnew's dog was certified to sniff out marijuana or just hard drugs. Stansberry testified that he was not comfortable relying on Agnew's dog for probable cause. The agents took the bag back to the DEA office and placed the bag in the atrium area of the building. Detective Whittredge arrived with Homer at approximately 7:00 p.m. After Homer alerted on the suitcase, the agents obtained a search warrant. Stansberry testified that the suitcase contained three Christmas packages which contained marijuana and suspected cocaine and methamphetamine.

Detective James Whittredge of the Wichita Police Department testified that on December 11, 1992 at approximately 6:00 p.m., he received a call requesting that he come out to the airport with Homer. Whittredge was busy with other matters at that time. The only other canine handler with the Wichita Police Department was Officer Agnew, who responded to the request. Whittredge was contacted again approximately 45 minutes later and was requested to bring Homer to DEA headquarters. Whittredge testified about Homer's reaction to the suitcase hidden in the lobby of the DEA office building. Homer alerts by scratching and pawing at the item in question. Homer alerted to Lambert's suitcase.

Whittredge testified about the training he and Homer received. Whittredge and Homer were certified in narcotics detection in June 1992 by Canine Unlimited. In September 1992, Homer was certified for narcotics detection by the North American Police Work Dog Association. Whittredge further testified that Homer had never received any injuries or suffered any illnesses or afflictions which would affect his sense of smell.

Officer Bradley Agnew of the Wichita Police Department testified regarding his dog, Rocco. Rocco is trained for various types of police work, including narcotics detection. Agnew and Rocco were certified as a team by Canine Unlimited in June 1992 for police patrol and narcotics detection. Agnew testified that Rocco never lost his certification nor had Rocco ever suffered an injury or illness which would affect his sense of smell. In September 1992, Rocco was certified by the North American Police Work Dog Association (NAPWDA) in six categories, not including narcotics detection. (The categories other than narcotic-explosive-cadaver detection are: obedience, agility, article search, area search, tracking, building search, aggression control and bloodhound tracking. *See* Defendant's Exh. I). Agnew testified that Rocco was intended to be a multi-purpose dog and is trained to search for people or articles and to search buildings, among

other tasks. Agnew testified that he wanted to obtain certification for Rocco in as many areas as possible on September 24, 1992 at the NAPWDA testing. Because there was a long line of officers and dogs waiting to be tested on narcotics detection, Agnew skipped putting Rocco through the narcotics certification. Agnew testified that in narcotics detection situations, Rocco correctly alerts approximately 80% to 90% of the time.

Agnew testified that he received a call over the radio at approximately 5:45 to 6:00 p.m. on December 11, 1992 that he was needed at the airport. It took Agnew approximately 15 to 20 minutes to arrive at the airport. When Agnew arrived, pieces of luggage were already set up in a back area for Rocco to sniff. Rocco sniffed the luggage on two separate occasions. Agnew testified that Rocco alerted on Lambert's suitcase both times. Agnew testified that the first alert was Rocco's "old" alert—Rocco put his nose to the bag, sniffed heavily, looked over his shoulder at Agnew, and repeated the process. After a five or ten minute break, Agnew again exposed Rocco to the luggage in the room. This time, Rocco responded with his "new" alert—scratching at the bag with both front paws. Agnew testified that in December 1992, he was in the process of teaching Rocco to use a scratch indication for an alert.

Task Force Agent M.W. McDonald testified that he was present at the airport on December 11, 1992 with Agents Joyce and Stansberry. McDonald was waiting in the public baggage claim area and noticed a man (later identified as the defendant Robert Lambert) who appeared to be very nervous. Lambert appeared to be looking around and looking at the doorways and exits. McDonald saw Lambert approach the baggage belt, grab his bag, and leave. McDonald did not follow Lambert to the parking lot, but instead stayed on the sidewalk approximately 50 to 75 yards away. Later, while the application for search warrant was being prepared, McDonald attempted to locate Spirit Lake, Iowa on a map. McDonald also contacted the Sioux Falls, South Dakota DEA office. McDonald testified that Spirit Lake, Iowa is approximately 680 miles away from Wichita.

The defendant presented evidence from the business records of American Airlines that showed that Lambert made his reservation at 5:10 a.m. on December 11, 1992. The ticket was purchased at 9:25 a.m. The flight was scheduled to depart Los Angeles at 10:03 a.m. The flight was scheduled to arrive in Wichita at 4:59 p.m. and actually arrived at 5:02 p.m. The defendant also presented the testimony of a travel agent, who opined that the belief that the Wichita airport is an expensive point of departure is not true.

The record is not entirely clear as to the length of time the defendant's drivers license was retained by the agents. Agent Stansberry originally testified that the license was returned with the receipt immediately before Lambert left the airport parking lot. At the second hearing, Stansberry attempted to waffle a bit. Stansberry testified that his standard practice is to return a person's license immediately. The court finds that the agents retained Lambert's license from the time he was requested to present identification until the time he was allowed to leave.

The court finds no deception or withholding of discovery materials regarding the narcotics detection dogs by the United States Attorney or any agent on the case. Because of the concern about Rocco's certification, the agents decided to use Homer to sniff the suitcase a second time. Homer's response of alerting was presented to the District Judge, who then issued a search warrant.

On review of a ruling on a motion to suppress, the district court's factual findings will be upheld unless clearly erroneous. The ultimate determination of reasonableness under the fourth amendment is a conclusion of law, which is reviewed de novo on appeal. *See United States v. Morales–Zamora,* 974 F.2d 149, 151 (10th Cir.1992).

For the reasons set forth below, the court makes the following findings and conclusions. The initial encounter between the agents and Lambert was a consensual one. If the encounter ceased to be consensual because the agents retained Lambert's drivers license, the encounter became no more than an investigative detention, which must be supported by reasonable suspicion. The agents pos-

sessed reasonable suspicion to continue questioning Lambert based on Lambert's suspicious responses to their questions. The agents possessed reasonable suspicion to detain Lambert's suitcase for a sniff by a narcotics detection dog. The first dog sniff resulted in an alert to the presence of drugs and provided probable cause to obtain a search warrant. The second dog sniff was redundant, although conducted in good faith based on the agents' concern as to the certification of the first narcotics detection dog. The matters presented to the demonstrated probable cause for the issuance of a search warrant.

■ Encounters between the police and citizens fall into three general categories: (1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment; (2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by reasonable suspicion of criminal activity; and (3) arrests, which are the most intrusive of Fourth Amendment seizures and must be supported by probable cause. *United States v. Bloom,* 975 F.2d 1447, 1450–51 (10th Cir. 1992); *United States v. Ward,* 961 F.2d 1526, 1529 (10th Cir.1992). A police officer's physical restraint of a person is clearly a seizure. *Bloom,* 975 F.2d at 1451. In cases in which no physical restraint occurs, the court must determine whether the police conduct, in light of the surrounding circumstances, would communicate to a reasonable person that she or he was not free to decline the officer's request or otherwise terminate the encounter. *Id.*

■ The Supreme Court has recently reiterated that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). If a reasonable person would feel free "to disregard the police and go about his business," the encounter is consensual and reasonable suspicion is not required. *Id.* (quoting *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991)). Officers may approach an individual and ask

questions randomly or on a hunch. *United States v. Manuel,* 992 F.2d 272, 274 (10th Cir.1993). To determine whether a particular police-citizen encounter constitutes a seizure, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick,* —— U.S. at ——, 111 S.Ct. at 2389. The rule applies whether the encounter occurs in a public place such as a city street or airport lobby, or in the confines of a bus. *Id.*

■ The initial contact between the agents and defendant, in which Agent Joyce asked to speak to the defendant, was consensual and did not implicate the Fourth Amendment. Law enforcement officials do not violate the Fourth Amendment by approaching an individual in a public place, by asking the individual if he or she is willing to answer some questions, or by putting questions to the individual if he or she is willing to listen. *See Bostick,* —— U.S. at ——, 111 S.Ct. at 2386 (quoting *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion)); *United States v. Bell,* 892 F.2d 959, 965 (10th Cir.1989), *cert. denied,* 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990). Even when law enforcement officers have no basis for suspecting a particular individual, they may ask questions of that individual, ask to examine that individual's identification, and request consent to search the individual's luggage, as long as the officers do not convey the message that compliance with their requests is required. *Bostick,* —— U.S. at ——, 111 S.Ct. at 2386; *Manuel,* 992 F.2d at 274. Assuming that the agents' failure to return Lambert's drivers license rendered the encounter nonconsensual, it became no more than an investigative detention requiring reasonable suspicion. *See United States v. Walker,* 933 F.2d 812, 817 (10th Cir.1991) (traffic stop case; encounter not consensual because retention of license prevented driver from leaving), *cert. denied,* —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992).

Law enforcement officers with reasonable articulable suspicion that a piece of luggage contains narcotics may seize and briefly detain the luggage to investigate the circumstances that aroused the suspicion. *United States v. Hall*, 978 F.2d 616, 620 (10th Cir.1992); *United States v. Scales*, 903 F.2d 765, 768 (10th Cir.1990). Thus, in the present case, the temporary detention of Lambert's suitcase may be sustained upon a finding of articulable suspicion. *See United States v. McIntyre*, 997 F.2d 687, 696 n. 6 (10th Cir.1993). The determination of reasonable suspicion is made from the totality of the circumstances. *Hall*, 978 F.2d at 620.

For purposes of the Fourth Amendment, a seizure of property occurs when an officer exercises control over it by removing it from an individual's possession, or when an officer informs the individual that he is going to take the property. *Hall*, 978 F.2d at 619. The same degree of reasonable suspicion is required to detain a person as is required to detain a person's luggage. *Id.* at 620–21.

The exercise of a right to refuse consent to search cannot alone be the basis of reasonable suspicion. *United States v. Manuel*, 992 F.2d 272, 274 (10th Cir.1993).

Subjecting a piece of luggage to a narcotics detection dog does not constitute a search within the meaning of the Fourth Amendment, because the manner of obtaining the information and the information obtained are so limited. *Scales*, 903 F.2d at 768 (discussing *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). The taking of a person's luggage to subject it to a canine sniff is a seizure governed by the Fourth Amendment and analyzed under the investigative detention standard. *Id.* Two factors relevant to the assessment of whether the officers' conduct exceeds the permissible length of an investigative detention are the length of the detention and the diligence with which the officers pursued their investigation. *Id.* at 769 (discussing *Place*, 462 U.S. at 709, 103 S.Ct. at 2645).

The facts in the present case support a finding that the agents had reasonable suspicion to detain Lambert briefly for questioning and then to detain his luggage for a canine sniff. Agent Joyce had received information from an agent in Texas regarding a passenger on an American Airlines flight from Los Angeles to Wichita. The passenger, Robert Lambert, had purchased a cash, one way ticket shortly before flight time. Los Angeles is recognized as a source city for drugs. The method of purchase was consistent with the methods used by some drug traffickers. Information regarding the suitcase checked by Lambert allowed the agents to locate and identify the bag prior to the bag's release onto the baggage claim belt. The agents then noticed a nervous unknown male in the baggage claim area. That nervous individual turned out to be the owner of the suitcase and the person the agents were looking for. The agents observed Lambert retrieve the suitcase in question. Lambert then proceeded to exit the airport at a pace approaching a run. Lambert exhibited signs of nervousness before the officers knew his identity and before being confronted by law enforcement officers.

When the agents caught up with Lambert in the parking lot, they identified themselves and asked permission to speak to Lambert. The agents were not in uniform and did not coerce Lambert. At this point, the agents needed no suspicion whatsoever before asking Lambert some questions. However, also at this point, the agents possessed information approaching, if not already supplying, reasonable suspicion for an investigative detention of Lambert. The agents questioned Lambert to determine his identify and the purpose of his travels. In the course of answering the agents' questions, Lambert gave inconsistent and/or suspicious answers to their questions. Lambert stated that he was in Wichita on business, and then stated that he was not staying in Wichita but was returning to Iowa immediately. Lambert told the officers that he had gone to Los Angeles to sell a 1985 Pontiac Trans Am. However, when asked if he was carrying drugs or large sums of money, Lambert stated that he had not actually sold the car in Los Angeles. Lambert did not drive the 1985 Pontiac Trans Am to Los Angeles to

sell. Lambert drove a Ford Taurus to Wichita and flew from Wichita to Los Angeles. Lambert stated that it was cheaper to fly out of Wichita. Although the agents did not know the exact location of Lambert's hometown of Spirit Lake, Iowa, the agents knew there were other airports closer to Iowa, e.g., Kansas City, Missouri. The agents were also aware that an airport such as the one located in Kansas City would normally have cheaper airfares. Lambert allowed the agents to search his briefcase while refusing consent to search his suitcase. While each fact taken separately might be consistent with innocent travel, the totality of the circumstances supplied the officers with reasonable suspicion to seize the bag and have it sniffed by a narcotics detection dog.

The detention of Lambert at the airport was brief and Lambert was allowed to leave at the conclusion of the questioning and after the seizure of the suitcase. Lambert was advised that he was free to leave and he indeed left to return to Iowa. The detention of the suitcase at the airport was also brief. The first dog sniff occurred at the airport within approximately thirty minutes of the detention of the bag. The second dog sniff occurred approximately one hour later.

The agents adequately informed the defendant where they were taking the suitcase, how long he might be dispossessed of it, and how to arrange for the return of the bag if the investigation dispelled the suspicion. *See Place*, 462 U.S. at 710, 103 S.Ct. at 2646. The agents advised Lambert that the detention of the suitcase might be brief and that Lambert was welcome to stay if he wanted. Lambert stated that he wanted to leave and the agents allowed Lambert to leave.

 When a trained narcotics detection dog alerts to the presence of drugs in a piece of luggage, the law enforcement officials have probable cause to search the luggage. *United States v. Gonzalez–Acosta*, 989 F.2d 384, 388 (10th Cir.1993); *United States v. Barbee*, 968 F.2d 1026, 1030 (10th Cir.1992); *United States v. Pinedo–Montoya*, 966 F.2d 591, 594 (10th Cir.1992). In the present case, the first alert by Rocco at the airport provided probable cause to obtain a search warrant. Rocco was properly certified for narcotics

detection on the date in question. However, due to the agents' concern that Rocco was not properly certified for both marijuana and narcotics detection, the agents determined to submit the suitcase to a second canine. The exposure of the suitcase to a second canine turned out to be unnecessary, as the first canine was properly certified and correctly alerted to the presence of drugs. The fact that the agents continued to detain the suitcase in order to submit the suitcase to a second sniff test does nothing to alter the court's conclusion.

The court notes the Tenth Circuit's recent decision in *United States v. Gonzalez–Acosta*, 989 F.2d 384 (10th Cir.1993). In that case, the defendant filed a motion for pretrial production of the training file for the dog that sniffed (and alerted on) her vehicle. She sought "training records, veterinary records, false-positive/false-negative alert records and all other records establishing the dog's ability to smell." 989 F.2d at 388. The district court declined to order the production of those records. On appeal, the Tenth Circuit affirmed. The court held that the records were not relevant:

> First, we do not believe the documents were relevant because the dog was certified on the day in question and because the dog properly alerted to the presence of contraband.... Indeed, had the dog's records indicated it had false-alerted in the past, defendant's ability to cross-examine would not have been enhanced because there is no doubt it correctly alerted in this instance.

989 F.2d at 389 (citations omitted). This court allowed the production of certain records on the narcotics detection dogs. The court found those records to be relevant, notwithstanding that the dogs were certified on the date in question and the dogs properly alerted to the presence of drugs. Records on the dogs' training, certification, and past success rates were relevant for the defendant's cross examination of the two dog handlers.

**IT IS BY THE COURT THEREFORE ORDERED** that defendant's motion for discovery of detector dog information (Doc. 38) is hereby granted in part and denied in part.

IT IS FURTHER ORDERED that the government's motion to file response out of time (Doc. 30) is moot.

IT IS FURTHER ORDERED that defendant's motion to suppress (Doc. 25) is hereby denied.