UNITED STATES of America,
Plaintiff–Appellant,

v.

Larry Earl SANDERS,
Defendant–Appellee.

No. 90–2216.

United States Court of Appeals,
Tenth Circuit.

June 24, 1991.

Richard A. Friedman, Dept. of Justice, Washington, D.C., (William L. Lutz, U.S. Atty., David N. Williams, Thomas L. English, Asst. U.S. Attys., Albuquerque, N.M., with him on the brief), for plaintiff-appellant.

James B. Foy, Silver City, N.M., for defendant-appellee.

Before MOORE and BRORBY, Circuit Judges, and VAN BEBBER,[*] District Judge.

BRORBY, Circuit Judge.

The United States appeals the order of the district court granting Defendant's motion to suppress evidence seized from a pickup truck at a permanent border checkpoint.

The facts were developed during a hearing upon the motion to suppress and are undisputed and uncontested as the only evidence given at this hearing came from two border patrol agents. At 2:30 a.m., Defendant drove a pickup bearing California license plates into the primary inspection area of the permanent border patrol checkpoint located on the westbound portion of Interstate 10 about forty miles from the Mexico–United States border. This highway carries auto traffic from the Juarez, Mexico–El Paso, Texas area to California. As the pickup came to a stop, the border patrol agent's attention was caught by two pickup-style black tool boxes located in the bed of the pickup. This caught the agent's attention as while he had seen numerous pickups with one of these tool boxes, he had never before seen a pickup containing two. The agent had previously found illegal narcotics secreted in this type of tool box. The border patrol found illegal narcotics in vehicles at this checkpoint from five to fifteen times each day.

After the pickup stopped, the agent asked Defendant if he was a citizen of the United States and received a positive answer. He then asked Defendant if he was coming from the El Paso border area and Defendant stated he was from California, had come to El Paso from Arizona and stayed in El Paso a couple of days to visit friends, and was returning to Arizona. The border patrol agent then asked Defendant what he was carrying inside the tool boxes, and Defendant replied: "[W]ell, what are you looking for?" At this point, the border patrol agent testified he became suspicious due to the presence of two tool boxes, the fact that these type of tool boxes had been utilized to secrete drugs, and by the fact that Defendant had given a detailed answer to the question concerning where he had been and avoided answering the question concerning what was in the tool boxes. Defendant had been at this primary inspection for a short time.[1] Due to the fact that two vehicles and several semitrailers were stopped on the ramp behind Defendant's vehicle, the border patrol agent requested Defendant drive the pickup approximately thirty feet to a secondary inspection area. He would have kept Defendant and his vehicle at the primary inspection area longer but for the traffic back-up.

At the secondary inspection area, as the border patrol agent was approaching the pickup, Defendant, who had already exited the pickup, stated: "[O]h, you're Border Patrol. You're looking for illegal aliens," and began to open the two tool box doors that were on the driver's side of the pickup. At this time, a second border patrol agent walked over to the passenger side of the pickup to open the tool box doors on that side of the pickup. As he did he saw a cellular telephone, a pair of binoculars and the barrel of a large caliber weapon in the front seat. These objects increased the first border patrol agent's suspicions because he knew from experience that narcotic smugglers use binoculars to scout inspection checkpoints and cellular phones to receive reports concerning checkpoint operations. At this point, the first agent asked Defendant if the weapon was loaded and if he had any other weapons on his person or in the vehicle. Defendant looked down at the ground, his hands became fidgety, and he asked the agent: "[H]ow much trouble am I in?" Defendant began to pace, and replied the gun was loaded. The border patrol agent then asked who was the owner

---

[*] The Honorable G. Thomas Van Bebber, United States District Court Judge for the District of Kansas, sitting by designation.

1. The record shows only five minutes elapsed between the time Defendant arrived at the border checkpoint until he received his *Miranda* warnings. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

of the pickup and Defendant said "Jim," but that he did not know Jim's last name.

The agent then requested permission to search the vehicle and received Defendant's permission. The agent opened the driver's door, folded the seat forward and saw a gallon jar. The lid was opened, and the agent detected a very strong chemical odor, which was similar to that he had experienced in clandestine methamphetamine laboratories. Defendant stated it was only water in the jar and he picked up the jar to his mouth, tilted his head back, and then spit the liquid back into the jar. At this time, Defendant then wiped his mouth and said: "[S]ee, it's just water." At this time, the agent advised Defendant of his *Miranda* rights and again received permission to search the vehicle. Up to this point, Defendant had been in the secondary inspection area but a few minutes. During the search, a quantity of methamphetamine was found. Defendant was subsequently indicted for possessing more than ten grams of methamphetamine with intent to distribute and with carrying and using a firearm during and in relation to a drug crime. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B); 18 U.S.C. § 924(c).

Defense counsel premised his argument at the suppression hearing on his theory that there was no reasonable articulable suspicion to refer Defendant to the secondary inspection area.

The district court, having heard the above evidence, agreed with Defendant and granted the motion, stating from the bench as follows:

Okay. The motion to suppress will be granted. I don't think [*United States v. Benitez*, 899 F.2d 995 (10th Cir.1990)] is authority for the proposition and scenario that we have in this case. Apparently in *Benitez*, the defendant was stopped at a checkpoint, appeared tense when he was there, and he was, apparently he was at primary all the way through. And as he was asked if he would permit the search, and he got out and opened the trunk.

That's not the situation that we have here. The situation that we have here is a person approaching—excuse me, a person who went to the primary checkpoint. He was asked to stop there and, I mean, he did stop there. And the alleged circumstances which you say justify the suspicion that the person was engaged in criminal activity I don't accept that. I mean, we have—the use of these tool boxes is something that is widespread and, of course, the use of those tool boxes at the border areas is widespread.

The response to "what's in those boxes," "what are you looking for?" is a perfectly natural one. So, I don't feel that the detention, beyond the detention at primary, was justified in the case, so the motion will be granted.

In response to a question from the prosecutor, the court further stated:

I'm just ruling that in this case the defendant was held beyond the appropriate time that he should have been, for the appropriate inquiries that could be made in the period of time that it takes to make those inquiries. I'm not requiring beyond that.

The district court's entire findings and conclusions are quoted above. It appears the district court accepted the credibility of the two border patrol agents. It further appears the district court had a dual rationale underlying its decision: first, the circumstances failed to "justify the suspicion that the person was engaged in criminal activity"; and second, "defendant was held beyond the appropriate time ... for the appropriate inquiries."

The Government appeals from the district court's order granting Defendant's motion to suppress asserting the border patrol agent's conduct was objectively reasonable under the Fourth Amendment. Defendant responds that any detention beyond verifying citizenship is unreasonable when objectively reasonable circumstances warranting further questioning fail to exist.

■ Our decision in this case is facilitated by reviewing the law applicable to stops at permanent border checkpoints. A permanent border checkpoint need not be located on the border. *United States v.*

*Martinez–Fuerte,* 428 U.S. 543, 553, 96 S.Ct. 3074, 3080, 49 L.Ed.2d 1116 (1976). Stops and limited questioning may be asked in the absence of any individualized suspicion at reasonably located checkpoints. *Id.* at 562, 96 S.Ct. at 3084. No individualized suspicion is necessary to stop, question and then selectively refer motorists to a secondary inspection checkpoint. *Id.* at 563, 96 S.Ct. at 3085; *United States v. Rubio–Rivera,* 917 F.2d 1271, 1275 (10th Cir.1990). Border patrol agents have "virtually unlimited discretion to refer cars to the secondary inspection area." *INS v. Delgado,* 466 U.S. 210, 224 n. 6, 104 S.Ct. 1758, 1766 n. 6, 80 L.Ed.2d 247 (1984) (Powell, J., concurring); *United States v. Price,* 869 F.2d 801, 802–04 (5th Cir.1989); *Jasinski v. Adams,* 781 F.2d 843, 847–848 n. 7 (11th Cir.1986); *United States v. Garcia,* 616 F.2d 210, 211–12 (5th Cir.1980) (*per curiam*); *United States v. Lopez,* 581 F.2d 1338, 1342–43 (9th Cir.1978).

We next look to the law defining permissible questioning at permanent border checkpoints. Questions may be asked in the absence of any individualized suspicion. *Martinez–Fuerte,* 428 U.S. at 562, 96 S.Ct. at 3085. Border patrol agents may "question individuals regarding suspicious circumstances, in addition to citizenship matters, when those individuals are stopped at a permanent checkpoint." *United States v. Benitez,* 899 F.2d 995, 998 (10th Cir.1990). But any further detention must be based on the individual's consent or probable cause, *United States v. Espinosa,* 782 F.2d 888, 891 (10th Cir.1986), or upon a valid investigative detention, *Espinosa,* 782 F.2d at 890; *see also Rubio–Rivera,* 917 F.2d at 1276–77 (validity of investigative detention decided on common-sense approach based on ordinary human experience). Detention and search beyond the routine customs inspection requires " 'reasonable suspicion' ... justified by a particularized and objective basis for suspecting the particular person of smuggling contraband." *United States v. Carreon,* 872 F.2d 1436, 1440 (10th Cir.1989) (citing *United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 (1985)). Officers may not se-

lectively search vehicles at a border unless they have probable cause or consent to justify the search. *United States v. Ortiz,* 422 U.S. 891, 896–97, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975).

We now apply these principles to the facts before us. Upon Defendant's arrival at the permanent border patrol checkpoint he was asked three questions. Defendant was then directed to the secondary inspection area because, as the record reveals, traffic was backing up. Although the law requires no suspicious circumstances to refer a motorist to a secondary inspection area at a permanent border checkpoint, *Rubio–Rivera,* 917 F.2d at 1275, we note the border patrol agent here had suspicions because Defendant was travelling in the middle of the night, was carrying two tool boxes, and because of the way Defendant answered questions. Defendant responded to the first two questions concerning his citizenship and destination in detail; Defendant was evasive, however, when asked what he was carrying in the two tool boxes which were in plain view in the open bed of his pickup truck.

When the border patrol agent directed Defendant to the secondary inspection area, the agent did not have probable cause to suspect a crime was being committed, nor did he have the articulated, individualized and reasonable suspicion envisioned by the Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to justify an investigative detention. *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (government conduct under the Fourth Amendment evaluated based on objective facts). Nevertheless, because this encounter occurred at a permanent border checkpoint where "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government," *Montoya de Hernandez,* 473 U.S. at 540, 105 S.Ct. at 3309, we hold that directing Defendant to the secondary inspection area to answer additional questions is permissible under the Fourth

Amendment. This holding is consistent with Supreme Court teachings instructing that no particularized reason need exist to justify referring a motorist to a secondary inspection area. *Martinez–Fuerte*, 428 U.S. at 563, 96 S.Ct. at 3085. Border patrol officers have wide discretion in selecting which motorists to divert to a secondary inspection area for brief questioning. *Id.* at 563–64, 96 S.Ct. at 3085. The district court, in holding "defendant was held beyond the appropriate time … for the appropriate inquiries," misapprehended the law. Defendant was at the primary inspection area only a brief time—just long enough to answer but three questions.

█ Immediately upon Defendant's arrival at the secondary inspection area, factual evidence developed that warranted his continued detention. This evidence was discovered prior to the asking of any questions at the secondary checkpoint. As the two border patrol agents arrived at the pickup, one went to the passenger side to open the tool box doors on that side of the pickup. Defendant was already outside of the truck and opening the tool box door on his side. As the agent who was to inspect the passenger side was walking by the pickup cab he saw the cellular phone, binoculars and gun. At this point the agents were entitled to ask Defendant more than the normal brief questions one would expect during a routine secondary inspection. Certainly an agent was entitled to ask Defendant if his gun was loaded and if he had further weapons on his person or in the truck. Defendant's counsel candidly and correctly concedes that when the border patrol agents saw what was in plain view through the window of the pickup, the agents had articulable and reasonable suspicions to continue detaining and questioning Defendant in greater detail under *Terry*. *Espinosa*, 782 F.2d at 890 (investigative detention is justified where specific and articulable facts and rational inferences from those facts give rise to reasonable suspicion that a person has committed or is committing a crime) (citing *Terry*).

Because the border patrol agents observed evidence at the secondary checkpoint entitling them to hold Defendant for more than the few minutes necessary to complete routine border questioning based on "suspicious circumstances," it is technically unnecessary to discuss the extent of questioning that could have been based upon mere "suspicious circumstances." *See Carreon*, 872 F.2d at 1440 (approving of detention and search beyond routine border customs inspection when reasonable suspicion of criminal activity is present as justified by a particularized and objective basis). However, because the district court premised its decision disapproving of Defendant's detention on what it perceived was an absence of suspicious circumstances, a few words on this matter are called for.

█ Detention and questioning at borders based only on suspicious circumstances are approved as consistent with the accepted government policy of ensuring that only United States citizens and authorized aliens lawfully enter this country, and that no one is permitted to secrete contraband through the border. To further this policy, routine questions at permanent border checkpoints are therefore not required to meet the more rigid Fourth Amendment requirements of probable cause or reasonable suspicion. Border agents may ask a driver and passengers to explain suspicious circumstances. *Espinosa*, 782 F.2d at 891. "The Fourth Amendment does not require police officers to close their eyes to suspicious circumstances." *Id.*

█ In construing what "suspicious circumstances" means, courts should recognize there is no single or narrow definition available to answer all scenarios. Accordingly, some deference is properly given to border patrol agents who, as law enforcement officers, are specifically trained to look for indicia of crime, with an emphasis on immigration and customs laws. So long as their interrogation bears a reasonable relationship to their unique duties, the judiciary is properly reluctant to interfere, and a reviewing court should only determine whether the suspicious circumstances as perceived by the border patrol agent are supported by the facts.

In this case, some of the facts the government relies on to justify a few extra questions based on "suspicious circumstances" at a border do not, by themselves, justify extended interrogation. The fact that Defendant here was travelling in the middle of the night on a busy interstate highway can not, by itself, create suspicious circumstances that can lead to an objectively reasonable suspicion that something is wrong. Contraband can be, and unfortunately is, smuggled at any time. To claim suspicious circumstances based solely on the time of day an individual chooses to travel risks labeling all who travel on what some feel is an unusual hour as suspicious. It would, for instance, potentially implicate all the motorists who were waiting in line behind Defendant as suspicious persons who require some amount of extra questioning to explain "suspicious circumstances."

Nor can the government successfully label the fact that drugs are found in vehicles, or that Defendant was carrying one or two tool boxes, as suspicious circumstances by themselves. Such a broad definition would, once again, brand all cargo or container carrying motorists who pass through permanent checkpoints on interstate highways as persons who need a bit more than just the routine border inquiry to explain "suspicious circumstances."

On the other hand, the facts here clearly indicate a few more questions to explain "suspicious circumstances" were in order. Defendant was asked and answered questions about his citizenship and destination. However, when asked what he was carrying in his two tool boxes, Defendant responded by asking what the border patrol agent was looking for. In answering a question with a question, a reasonable person must assume the conversation will continue for a few more moments. Also, the fact that a person suddenly changes from being cooperative and responsive, to unresponsive, objectively indicates the need for more questions. No reasonable person talking to a trained law enforcement officer can expect to effectuate such a drastic change in behavior without giving the border officer some ground for concern, and thus a legitimate basis for asking more questions to explain the "suspicious circumstances." Examples of the type of questions a border officer could ask includes who owns the pickup. Agents might also reasonably ask for a copy of the vehicle registration. If they were concerned about some cargo or containers, as they were here, they might further ask whether the driver owns the items and their contents. These questions are, of course, just examples of the possible appropriate queries a border officer may make to allay his fears concerning suspicious circumstances.

In this case, these are the type of inquiries the border agents initially made after referring Defendant to the secondary inspection area. The agents commendably stuck with this limited form of questioning until Defendant was read his *Miranda* warnings, approximately four minutes after arriving at the secondary checkpoint. The agents generally restricted their questioning, even though they had spotted sufficient evidence—such as the gun—to warrant detaining and questioning the Defendant based on the more rigorous Fourth Amendment standard of reasonable suspicion. Based on a common sense view of the totality of the circumstances, the initial questions at the secondary checkpoint were not unacceptable based on the suspicious circumstances the Defendant created when he suddenly became unresponsive at the primary checkpoint. The facts support the border patrol agent's belief that suspicious circumstances were present here.

In conclusion, the border agents possessed broad discretion to refer Defendant to the secondary inspection area at the border checkpoint. Once at the secondary inspection area, the agents immediately obtained objective evidence that created a reasonable suspicion of wrongdoing. This justified the continued detention and more thorough questioning of Defendant. However, even if they had not immediately obtained such evidence, the agents could have lawfully asked Defendant more questions based on the suspicious circumstances as revealed by the totality of the circumstances. These circumstances included De-

fendant's responding to the border officer's question with a question of his own, indicating that the conversation would naturally continue a few moments longer. Given the undisputed fact that traffic was backing up, and that Defendant was being unresponsive, suspicious circumstances were present so that some further questioning was warranted.

The decision of the district court is REVERSED. The case is REMANDED to the district court for such further proceedings as may be consistent with this opinion.