**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William D. LUDLOW, Defendant–
Appellant.**

**No. 92–2122.**

United States Court of Appeals,
Tenth Circuit.

April 27, 1993.

---

William D. Fry, Asst. Federal Public Defender (R Morgan Lyman, Asst. Federal Public Defender, on the brief), Las Cruces, NM, for defendant-appellant.

Kelly Burnham, Asst. U.S. Atty. (Don J. Svet, U.S. Atty., and Charles L. Barth, Asst. U.S. Atty., on the brief), D. N.M., Las Cruces, NM, for plaintiff-appellee.

Before McKAY, Chief Judge, MOORE, and ANDERSON, Circuit Judges.

McKAY, Chief Judge.

In this criminal action, William D. Ludlow appeals the denial of his motion to suppress evidence that was seized at a Border Patrol checkpoint he attempted to travel through.

At 8:40 p.m. on October 29, 1992, Mr. Ludlow drove a Datsun 280–Z into the primary inspection area of a permanent Border Patrol checkpoint west of Las Cruces, New Mexico. The Border Patrol agent noticed that the driver's side window was only par-

tially lowered. When the agent asked Mr. Ludlow to lower the window further so he could speak with him and be heard, Mr. Ludlow lowered the window further but did not lower it completely. The agent was suspicious because on prior occasions he had encountered motorists who avoided rolling down windows to prevent Border Patrol agents from smelling contraband contained within the vehicle.

After identifying himself as an immigration officer, the agent questioned Mr. Ludlow about his citizenship. The agent noticed perspiration on Mr. Ludlow's upper lip and noted that he acted confused and nervous. The agent also noticed three suitcases in the car and was informed by Mr. Ludlow that they were his.

The vehicle bore Texas license plates. As a result, the agent believed Mr. Ludlow was from Texas and was curious about his nervous and confused reactions because in his experience, most residents of Texas are familiar with the Border Patrol and its activities.

The agent asked Mr. Ludlow who owned the car and was informed that it belonged to a friend. When the agent asked for the car's registration, he noted that Mr. Ludlow looked for the registration but appeared to be just going through the motions rather than actually concentrating on finding it. When Mr. Ludlow could not find the registration, the agent referred him to the secondary inspection area to "run a check on the vehicle and also to inquire for further questioning as to the nervousness that he was displaying." (Tr. at 10.)

At the secondary inspection area, Mr. Ludlow stated several times that there could be nothing wrong with the car because its owner was a California state worker. Because the agent believed that either the car was stolen or that there was something illegal in the suitcases, he informed Mr. Ludlow that he would be running a check on the car and asked permission to search the suitcases. Mr. Ludlow consented.

Mr. Ludlow again asserted that nothing could be wrong with the car because a state worker owned it. The agent asked permission for a dog to inspect the car. Mr. Ludlow consented and then disclaimed ownership of two of the suitcases in the car. After a dog alerted to the presence of contraband in the car, agents examined the suitcases and discovered approximately sixty pounds of marijuana.

The district court denied Mr. Ludlow's motion to suppress on Fourth Amendment grounds, and Mr. Ludlow entered a conditional plea of guilty, reserving the right to bring this appeal.

Mr. Ludlow asserts his detention was unlawful in this case and argues the evidence seized should be suppressed as "fruit of the poisonous tree," citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). More specifically, he contends that the Border Patrol agent did not have the necessary reasonable suspicion to refer him to the secondary inspection area and that the referral was carried out for an improper purpose, namely requesting consent to search the suitcases.

The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." As we have previously noted, "The Fourth Amendment is not a guarantee against all searches and seizure, but only against unreasonable searches and seizures." *United States v. Espinosa,* 782 F.2d 888, 890 (10th Cir.1986).

In *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court examined the reasonableness of seizures at permanent Border Patrol checkpoints, balancing the government's need to enforce customs and immigration laws against the intrusion on motorists passing through the checkpoints.

> We note ... the substantiality of the public interest in the practice of routine stops for inquiry at permanent checkpoints.... These checkpoints are located on important highways; in their absence such highways would offer illegal aliens a quick and safe route into the interior. Routine checkpoint inquiries apprehend many smugglers and illegal aliens who succumb

to the lure of such highways. And the prospect of such inquiries forces others onto less efficient roads that are less heavily traveled, slowing their movement and making them more vulnerable to deception by roving patrols.

. . . .

A requirement that stops on major routes inland always be based on reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens. In particular, such a requirement would largely eliminate any deterrent to the conduct of well-disguised smuggling operations, even though smugglers are known to use these highways regularly.

. . . .

While the need to make routine checkpoint stops is great, the consequent intrusion on Fourth Amendment interests is quite limited. The stop does intrude to a limited extent on motorists' right to "free passage without interruption," *Carroll v. United States*, 267 U.S. 132, 154 [45 S.Ct. 280, 285, 69 L.Ed. 543] (1925), and arguably on their right to personal security. But it involves only a brief detention of travelers during which "[a]ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States." *United States v. Brignoni–Ponce*, [422 U.S. 873], 880 [95 S.Ct. 2574, 2580, 45 L.Ed.2d 607] [ (1975) ]. Neither the vehicle nor its occupants are searched, and visual inspection of the vehicle is limited to what can be seen without a search.

. . . .

Routine checkpoint stops do not intrude [as much as roving patrols] on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. *Martinez–Fuerte*, 428 U.S. at 556–59, 96 S.Ct. at 3082–84 (other citations omitted).

The Court went on to hold that the stops and questioning "may be made in the absence of any individualized suspicion," *id.* at 562, 96 S.Ct. at 3085, "that it is constitutional to refer motorist selectively to the secondary inspection area [without reasonable suspicion]," *see id.* at 563, 96 S.Ct. at 3085, and "that the Border Patrol officers must have wide discretion in selecting the motorists to be diverted." *Id.* at 563–64, 96 S.Ct. at 3085.

Since *Martinez–Fuerte*, our cases have recognized that no individualized suspicion is necessary to stop, question, and then selectively refer motorists to a secondary inspection checkpoint, *id.* at 563, 96 S.Ct. at 3085; *United States v. Ray*, 973 F.2d 840, 842 (10th Cir.1992); *United States v. Pinedo–Montoya*, 966 F.2d 591, 593–94 (10th Cir.1992); *United States v. Sanders*, 937 F.2d 1495, 1499–1500 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992); *United States v. Rubio–Rivera*, 917 F.2d 1271, 1275 (10th Cir.1990), and that Border Patrol agents have virtually "unlimited discretion to refer cars to the secondary inspection area." *Pinedo–Montoya*, 966 F.2d at 593; *Sanders*, 937 F.2d at 1499; *Rubio–Rivera*, 917 F.2d at 1275.

■ Notwithstanding the clarity of our recent decisions specifically holding that no individualized suspicion is necessary to selectively refer motorists to secondary, it is apparent that confusion continues in this area. We perceive that the confusion stems from a misperception of the relationship between the proper scope of a routine checkpoint inquiry and the location in which that inquiry may take place. As our prior decisions indicate, Border Patrol agents have virtually unlimited discretion to selectively refer cars to the secondary inspection area.[1] Thus, a rou-

---

1. In *Martinez–Fuerte,* the Court specifically re-      jected the contention that referral to secondary

tine checkpoint inquiry may properly take place at a primary inspection area, a secondary inspection area, or both as long as the scope of the inquiry is appropriate.[2]

Because "[t]he principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop," *Martinez–Fuerte*, 428 U.S. at 566–67, 96 S.Ct. at 3087, it is important to review the scope of a permissible routine inquiry at a permanent Border Patrol checkpoint. Under a routine inquiry, the detention and questioning at a permanent checkpoint "involves only a brief detention," *id.* at 558, 96 S.Ct. at 3083, and neither the vehicle nor its occupants are searched; visual inspection of the vehicle is limited to what can be seen without a search. *Id.* at 558, 96 S.Ct. at 3083. Border Patrol agents may question occupants of a vehicle concerning citizenship and customs matters and ask them to explain suspicious circumstances or behavior.[3] *See Pinedo–Montoya*, 966 F.2d at 593–94; *Sanders*, 937 F.2d at 1499; *United States v. Benitez*, 899 F.2d 995, 998 (10th Cir.1990). Detention and questioning based solely on suspicious circumstances is warranted because of the accepted government policy of ensuring only authorized individuals enter into this country and to prevent the smuggling of contraband. *Sanders*, 937 F.2d at 1500.

Although the governmental needs at permanent Border Patrol checkpoints justify governmental intrusion unacceptable in other contexts, the scope of a permissible seizure and inquiry are not without limitation. Given the limited law enforcement role of Border Patrol agents with its emphasis on immigration and customs, questioning as to suspicious circumstances must bear "a reasonable relationship to [the agent's] unique duties." *Id.; see also United States v. Johnson*, 895 F.2d 693, 696 (10th Cir.1990) ("detention and search beyond a routine *Customs*

inspection may be undertaken only upon a reasonable suspicion standard") (emphasis added). Although some deference is properly given to an agent's determination of relevant suspicious circumstances given their unique training regarding indicia of crime, a court may properly intervene when "a common sense view of the totality of the circumstances" indicates the facts would not support an agent's conclusion that suspicious circumstance warranted further questioning. *Sanders*, 937 F.2d at 1500–01.

Therefore, if questioning reasonably related to immigration and customs matters and the agent's observations indicates suspicious circumstances, further questioning as part of the routine permanent checkpoint inquiry is permissible as long as the duration of the detention remains brief. If further inquiry within the time constraints of *Martinez–Fuerte* creates a reasonable suspicion that a crime is or has been committed, further investigative detention, which is outside the scope of a routine inquiry, may be warranted. *Pinedo–Montoya*, 966 F.2d at 594; *Johnson*, 895 F.2d at 696. However, in the absence of facts justifying further investigative detention, a motorist may not be further detained pursuant to a routine inquiry without consenting to such detention.

In the instant case, the district court made the following findings:

> Here we have the fact that he did not roll the window all the way down, and that would immediately, to a trained Border Patrol agent, raise the suspicion that there was an odor in the car that the driver did not want out. There's no showing that the night was cold or anything like that that would keep him from rolling down the window. When he did get a chance to look at him, he was perspiring under his nose. He was looking all around. He was generally nervous. He couldn't find the car

---

carried an additional element of intrusiveness because of the stigmatism attached to being one of only a small percentage of the cars that are diverted. *See id.* at 560, 96 S.Ct. at 3084.

**2.** As noted in *Martinez–Fuerte*, traffic and safety considerations often are related to a determination to refer a motorist to secondary. *Martinez–Fuerte*, 428 U.S. at 560, 96 S.Ct. at 3084.

**3.** As we have explained, the Fourth Amendment does not require police officers to close their eyes to suspicious behavior. *United States v. Johnson*, 895 F.2d 693, 696 (10th Cir.1990), quoting *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir.1986).

registration. The car did not belong to him....

(Tr. at 27.)

When reviewing a denial of a motion to suppress, the trial court's factual findings are to be accepted unless clearly erroneous, and the evidence is to be viewed in the light most favorable to the district court's findings. *E.g., Benitez,* 899 F.2d at 997. Applying this standard to the district court's findings, we conclude that the factual findings are not clearly erroneous. Moreover, applying these facts to the standards we have delineated regarding the permissible detention and questioning at a permanent Border Patrol checkpoint, we hold that the district court did not err in denying Mr. Ludlow's motion to suppress.

 The initial questioning at the primary inspection area was brief, lasting approximately 45 seconds. The agent's questions regarding Mr. Ludlow's citizenship and the ownership of the vehicle and its contents were entirely appropriate.[4] Together with his observations of Mr. Ludlow's demeanor and appearance, the circumstances justified the agent's conclusion that suspicious circumstances existed which would have warranted further detention and questioning as part of a routine inquiry. Likewise, we are of the view that the circumstances would have justified an investigative detention because the agent had a reasonable suspicion that Mr. Ludlow had committed, or was committing, a crime. Accordingly, under either analysis it was appropriate for Mr. Ludlow's detention and questioning to continue.[5]

Mr. Ludlow was informed that an NCIC check of his vehicle was being run, and at this juncture he consented to a search of the suitcases. Shortly thereafter a dog alerted to the presence of contraband and the marijuana was discovered.[6] Under these circumstances, we hold that Mr. Ludlow's detention was not improper. Because Mr. Ludlow's consent to search was obtained while he was properly being detained, Mr. Ludlow was not entitled to have the marijuana suppressed.[7] Therefore, the judgment of the district court is AFFIRMED.

---

4. Questions regarding Mr. Ludlow's citizenship and the contents of the vehicle were of course directly related to the Border Patrol agent's duties. Questions of vehicle ownership are likewise appropriate as reasonably related to the agent's duties for identification purposes and because of the common use of stolen vehicles in smuggling operations. We have previously rejected the contention that an inquiry into vehicle ownership is beyond the scope of a permissible inquiry as part of a routine inquiry. *See Rubio–Rivera,* 917 F.2d at 1276; *Johnson,* 895 F.2d at 696, 698.

5. In this case, further detention and questioning· happened to be conducted at the secondary inspection area. As previously noted, Border Patrol agents have virtually unlimited discretion to refer motorists to secondary as part of a routine inquiry as long as the scope of the detention is appropriate.

6. From the time Mr. Ludlow entered the primary checkpoint to the time he consented to further detention by consenting to a search was less than two minutes.

7. Mr. Ludlow does *not* dispute that he consented to a search of the vehicle, or that his consent was voluntary. (Appellant's Brief at 20.)