**UNITED STATES of America, Plaintiff,**

v.

**Maria Eugenia CARRILLO–
BERNAL, Defendant.**

**Crim. No. 94–173 MV.**

United States District Court,
D. New Mexico.

May 31, 1994.

Judith A. Patton, Asst. U.S. Atty., Las Cruces, New Mexico, for plaintiff.

Barbara A. Mandel, Asst. Federal Public Defender, Las Cruces, New Mexico, for defendant.

## MEMORANDUM OPINION AND ORDER

VAZQUEZ, District Judge.

The subject of this memorandum, opinion, and order is defendant's, Ms. Maria Eugenia Carrillo–Bernal's, motion to suppress, filed April 22, 1994. A hearing was held on this motion May 19, 1994. The Court finds after careful consideration of the facts and law that defendant's motion will be granted. The Court finds that the specific facts of this case do not support the Border Patrol agent's conclusion that "suspicious circumstances" existed sufficient to justify further detention of defendant.

On March 11, 1994, at approximately 5:45 p.m., the defendant, Maria Carrillo–Bernal, a Hispanic female, drove a 1982 Volkswagen Cabriolet convertible into the primary inspection area of a permanent United States Border Patrol checkpoint on Interstate 10 (I–10), approximately 20 miles west of Las

Cruces, New Mexico. The Border Patrol agent on duty at the checkpoint was Mr. Randy Holmes, who had been a Border Patrol agent for approximately three years at that time.

The traffic that travels through the I–10 checkpoint is extremely heavy. Approximately 24,000 vehicles go through the checkpoint in 48 hours. No testimony was presented as to the comparative volume of traffic that goes through the checkpoint at different times of the day or at different times of the week.

Ms. Carrillo–Bernal was driving a vehicle that appeared to have a permanent Texas license plate bearing the number MRM–11V. Agent Holmes' suspicion was not aroused by the appearance of the plate. First, after identifying himself as a Border Patrol agent, Agent Holmes asked Ms. Carrillo–Bernal to state her citizenship. Ms. Carrillo–Bernal responded by showing the agent her resident alien card. It is undisputed that her resident alien card satisfied Agent Holmes that she was entitled to live in the United States. There was nothing unusual about the card that aroused Agent Holmes' suspicion. Agent Holmes asked Ms. Carrillo–Bernal where she was coming from, and she responded that she was coming from El Paso, Texas, and that she was going to California.

At some point during this routine questioning, Agent Holmes asked Ms. Carrillo–Bernal to identify the registered owner of the vehicle. Testimony was not presented showing when, in relation to the other questions, this inquiry was made. Ms. Carrillo–Bernal responded that the registered owner was José Moreno. Agent Holmes did not request any proof that José Moreno was the registered owner of the vehicle.

During this routine questioning of Ms. Carrillo–Bernal, Agent Holmes testified that she did not appear nervous and answered his questions directly. He testified that she did not appear to be hiding anything from him. There was nothing unusual or suspicious about the way she answered the questions and she did not make any statements that he felt were incredible. In addition, Agent Holmes stated he did not detect any odors that are commonly used to mask the smell of controlled substances and the vehicle did not appear to be heavily loaded.

After asking these routine questions and receiving satisfactory answers that did not arouse his suspicions, Agent Holmes noticed that there was no luggage in the passenger compartment of the car. He also noticed that the interior of the car was exceptionally clean. These two facts formed the basis for Agent Holmes' assertion of suspicious circumstances justifying further detention. As a result of these factors, he asked Ms. Carrillo–Bernal if she had anything in the trunk. It should be noted that Agent Holmes testified on at least three separate occasions that he asked this question of defendant because he considered the lack of luggage in the passenger compartment of the car to be unusual. He gave no other reason for asking this question. He testified specifically that, in this case, the factor he relied upon was the absence of luggage in the passenger compartment of the car. In response to Agent Holmes' question, Ms. Carrillo–Bernal stated that she did not have anything in the trunk. The contents of the trunk were not visible unless the trunk was open. Agent Holmes then asked Ms. Carrillo–Bernal if he could look in the trunk. Although Agent Holmes had testified that the only suspicious circumstances were the absence of luggage in the passenger compartment and the cleanliness of the car, on cross-examination he testified that it crossed his mind that the car may have been stolen. Agent Holmes testified that whether or not there was luggage in the trunk, he would have further detained Ms. Carrillo–Bernal at the secondary stop to do a K–9 sniff of her vehicle.

Ms. Carrillo–Bernal gave Agent Holmes permission to look in the trunk and Agent Holmes directed her over to the secondary checkpoint to look in the trunk. Ms. Carrillo–Bernal had been detained at the primary checkpoint for not more than two minutes. Agent Holmes found only two jumper cables and a water jug in the trunk. Agent Holmes never asked Ms. Carrillo–Bernal to explain why she did not have any luggage in the car, in light of the fact that she was traveling from El Paso to California.

Agent Holmes then asked Ms. Carrillo–Bernal if she would permit him to do a K–9 sniff of her vehicle and she consented. K–9 "Nick," who was certified to detect marijuana on March 11, 1994, alerted to the presence of a controlled substance, and Border Patrol agents found approximately 60 pounds of marijuana in a false compartment beneath trap doors in the vehicle. The search of defendant's trunk and the K–9 sniff lasted approximately one-and-a-half minutes.

After the K–9 sniff and after defendant had been advised of her rights and placed under arrest, an NCIC and registration check were run on defendant's car and revealed that the car had a fictitious license plate. An airline ticket was found in Ms. Carrillo–Bernal's personal effects. Ms. Carrillo–Bernal, whose native tongue is Spanish, was presented with a Miranda waiver form written in Spanish. She refused to sign the form and invoked her right to counsel. Ms. Carrillo–Bernal was then placed by herself in a temporary cell at the Border Patrol checkpoint. Defendant described the cell as "a really small room" with two benches in it. While she was in the cell, several Border Patrol agents who were outside the cell were making jokes about defendant's situation. They specifically made reference to "José," the name of the man whom defendant had earlier stated was the owner of the car. The comments of the Border Patrol agents made defendant feel "dumb."

Approximately four hours later, Special Agent Brad Cox of the DEA came to Ms. Carrillo–Bernal's cell to transport her to jail in Las Cruces. It is undisputed that Special Agent Cox was cordial and polite towards Ms. Carrillo–Bernal. During the trip to the jail, Ms. Carrillo–Bernal told Special Agent Cox about how badly the other agents had behaved towards her. She testified Special Agent Cox made her feel like a lady. At that time she seemed anxious to talk about her circumstances. She testified that she wanted to get things "off her chest." Special Agent Brad Cox told her that he could not ask her any questions about her case because she had invoked her right to counsel. However, he told her that if she wanted to voluntarily make statements she could do so. Ms. Car-

rillo–Bernal made incriminatory statements to the effect that she was having a really bad day and that she had agreed to drive the car for a man, José Moreno, whom she met at a night club in California, whom she liked, and whom she wanted to impress.

Defendant argues that the facts in this case do not support the Border Patrol agent's assertion that there were "suspicious circumstances" justifying further detention of defendant. In other words, defendant argues that after the agent had asked defendant the routine questions with respect to her citizenship, destination, and vehicle registration, and after having received satisfactory answers which did not arouse his suspicions, the agent should have sent Ms. Carrillo–Bernal on her way. Defendant also argues that the agent in this case did not have "reasonable suspicion" to further detain her and therefore defendant's continued detention was illegal. The Government argues that the agent's questioning of Ms. Carrillo–Bernal was part of the routine inquiry permissible at permanent checkpoints. The Government further argues that any additional detention of defendant was based on her consent and therefore was lawful.

■ The Court finds that the agent's question with respect to the contents of the trunk of defendant's car was not part of the routine inquiry permitted at checkpoint stops. Further, since the absence of luggage in the passenger compartment of a very clean vehicle does not constitute "suspicious circumstances," there was no legal justification for detaining defendant beyond the routine questions. Therefore, Agent Holmes' continued detention of defendant to inquire about the contents of the trunk exceeded the scope of limited questioning permitted at fixed checkpoint stops and constituted an unreasonable seizure in violation of the Fourth Amendment.

In *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) the United States Supreme Court upheld the constitutionality of fixed checkpoint stops that were not supported by reasonable suspicion. The Court, in concluding that such stops were reasonable under the Fourth Amendment, balanced the public interest in

the practice of routine checkpoint stops, the purpose of which is to apprehend illegal aliens, against the interest of motorists in "free passage without interruption" and in "personal security." *Id.* at 557–58, 96 S.Ct. at 3083. The balance was struck in favor of the public's interest in maintaining checkpoint stops because of the "substantiality," *id.* at 556, 96 S.Ct. at 3082, of the public's interest in the apprehension of illegal aliens and because the intrusion upon motorists' Fourth Amendment interests was "quite limited." *Id.* The Court reasoned that a "checkpoint stop involves only a brief detention during which all that is required is a response to a brief question or two [concerning the motorist's citizenship or immigration status] and possibly the production of a document evidencing a right to be in the United States." *Id.* at 558, 96 S.Ct. at 3083, *citing United States v. Brignoni–Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975). The Court, however, emphasized that the principal protection of the Fourth Amendment rights at checkpoints [lay] in appropriate limitations on the scope of the stop. *Id.* at 567, 96 S.Ct. at 3087. The Court explicitly qualified its holding by stating that it was limited to the type of stops described in the opinion. *Id.* It added that any further detention must be based on probable cause or consent. *Id. citing Brignoni–Ponce,* 422 U.S. at 882, 95 S.Ct. at 2580.

■ Since the United States Supreme Court's decision in *Martinez–Fuerte,* the Tenth Circuit has delineated the appropriate scope of permissible questioning at permanent checkpoints, absent "reasonable suspicion," *United States v. Carreon,* 872 F.2d 1436, 1440 (10th Cir.1989), *citing United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 (1985), probable cause or consent. Border Patrol agents may briefly question motorists as to citizenship and immigration status, *United States v. Espinosa,* 782 F.2d 888, 891 (10th Cir.1986), but in addition, they may question the motorist about vehicle ownership and registration, *United States v. Rascon–Ortiz,* 994 F.2d 749 (10th Cir.1993), cargo, destination and travel plans, *id.,* and suspicious circumstances. *Espinosa,* 782 F.2d at 891. However, the Tenth Circuit has made it clear that any questioning beyond these matters must be supported by reasonable suspicion, probable cause, or consent. *See United States v. Carreon,* 872 F.2d. 1436, 1440 (10th Cir.1989); *see United States v. Espinosa,* 782 F.2d 888, 891 (10th Cir.1986), *citing Brignoni–Ponce,* 422 U.S. at 881–82, 95 S.Ct. at 2580.

■ With respect to "suspicious circumstances," the Tenth Circuit has held that when an officer observes "suspicious circumstances," the agent may briefly question the motorist concerning those suspicions and ask the motorist to explain. *United States v. Sanders,* 937 F.2d 1495, 1500 (10th Cir.1991). The Fourth Amendment does not require police officers to close their eyes to suspicious circumstances. *Espinosa,* 782 F.2d at 891.[1] While there is no single definition of

---

1. *Espinosa* was the seminal Tenth Circuit case that recognized that a Border Patrol agent, in addition to the routine Border Patrol inquiry, could ask about "suspicious circumstances." It is noteworthy, however, that the court equated "suspicious circumstances" with "reasonable suspicion." The court held that where probable cause or consent was lacking, a Border Patrol agent could nonetheless inquire as to suspicious circumstances. The court found that the agent's inquiry in that case was based upon "specific and articulable facts and rational inferences." *Id.* at 891. Such language is associated with "reasonable suspicion" as defined in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court then proceeded to quote from *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), in which the Court addressed the reach of a Terry stop and stated:

"a brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

Since *Espinosa,* the concept of "suspicious circumstances" has engendered much confusion among district courts and the term has at times been used interchangeably with "reasonable suspicion." However, the Tenth Circuit has relatively recently clarified that "suspicious circumstances" and "reasonable suspicion" are distinct legal concepts. *See, e.g., United States v. Rascon–Ortiz,* 994 F.2d 749, 752 n. 6 (10th Cir.1993) (A "suspicious circumstance" is not equivalent to the "reasonable suspicion" standard ... The presence of a suspicious circumstance allows a border patrol agent to ask a few additional ques-

what constitutes a "suspicious circumstance," border patrol agents are given deference in relying upon their law enforcement training and past experience in deciding whether a suspicious circumstance exists. *Sanders*, 937 F.2d at 1500. Nonetheless, the Fourth Amendment does not permit that law enforcement officers be given unbridled discretion in determining whom they should "seize,"[2] in this case, whom they should detain for "a bit more than just the routine border inquiry." *Id.* at 1501. They cannot merely invoke the magic words "suspicious circumstances" in order to justify the continued detention of a motorist if, in reality, the further detention is based on a mere hunch or inkling that the motorist is engaged in criminal activity. Such arbitrariness and unlimited discretion is incompatible with the Fourth Amendment's requirement of reasonableness.[3] The Tenth Circuit has recognized this hallmark principle underlying the Fourth Amendment by limiting the discretion of Border Patrol agents in their determination as to what constitutes "suspicious circumstances." This court has stated that although some deference is properly given to an agent's determination of relevant suspicious circumstances given their unique training regarding indicia of crime, a court may properly intervene when "a common sense view of the totality of the circumstances" indicates the facts would not support an agent's conclusion that suspicious circumstance[ ] warranted further questioning. *United States v. Ludlow*, 992 F.2d 260, 264 (10th Cir.1993), *citing United States v. Sanders*, 937 F.2d 1495, 1500–01 (10th Cir.1991).

In *United States v. Sanders*, 937 F.2d 1495 (10th Cir.1991), the Tenth Circuit held that neither reasonable suspicion nor probable cause were required to refer a motorist to the secondary checkpoint[4] in order to question the motorist about "suspicious circumstances." In that case, the court found that there were "suspicious circumstances" warranting further detention of the defendant at the secondary checkpoint. The facts constituting "suspicious circumstances" were as follows: the defendant was traveling in the middle of the night (2:30 a.m.); the officer noticed two black tool boxes in the bed of the pickup truck that defendant was driving; the tool boxes were like those in which the agent had formerly found illegal narcotic drugs; the agent had never before seen a pickup containing more than one of this type of tool box; after inquiry about defendant's citizenship and his travel plans, to which defendant gave an extremely detailed response, the agent inquired as to what the defendant was carrying in the tool boxes and the defendant did not give a direct answer, but instead responded with the question "what are you looking for?" *See id.* at 1499.

tions concerning the suspicion during the course of a routine customs inspection).

2. In *Martinez–Fuerte*, the United States Supreme Court recognized that a stop at a fixed checkpoint constituted a seizure. *See Martinez–Fuerte*, 428 U.S. at 556, 96 S.Ct. at 3082.

3. It should be noted that in *Martinez–Fuerte*, the United States Supreme Court permitted fixed checkpoint stops absent reasonable suspicion, probable cause, or consent, only where the questions asked of motorists were limited to matters of citizenship and immigration status. The Court's holding was expressly limited to such questions. It is also noteworthy that the type of checkpoint challenged in *Martinez–Fuerte* was one at which motorists would selectively be sent to the secondary checkpoint to be asked brief routine questions as to immigration and citizenship status. Thus, at the primary checkpoint, most motorists would be waved on, while, in the virtually unlimited discretion of the Border Patrol agents, a few would be directed to the secondary checkpoint. However, those few motorists directed to the secondary checkpoint would be asked only routine questions, absent reasonable suspicion, probable cause or consent. Thus, the agents were given virtually unlimited discretion to refer motorists to the secondary checkpoint only so that the Border Patrol agents could ask them routine questions. There was not unlimited discretion to refer motorists in order to be asked questions with respect to "suspicious circumstances." This is also consistent with Tenth Circuit law which does not permit Border Patrol agents unlimited discretion with respect to what constitutes "suspicious circumstances." *See United States v. Sanders*, 937 F.2d 1495, 1501 (10th Cir.1991).

4. The Tenth Circuit has clarified that it is not legally relevant whether the detention takes place at the primary or secondary checkpoint. *See United States v. Ludlow*, 992 F.2d 260, 263–64 (10th Cir.1993). Rather, the propriety of the detention turns on whether the officer exceeds the limited scope of inquiry permitted at fixed checkpoints. *See id.*

With respect to the permissible scope of inquiry at a fixed checkpoint stop, the court stated that "so long as an agent's interrogation bears a reasonable relationship to his unique duty, the judiciary is properly reluctant to interfere; the reviewing court should only determine whether the suspicious circumstances as perceived by the Border Patrol agent are supported by the facts." *Id.* at 1500. In *Sanders,* the court found that some of the facts the Government relied upon to justify a few extra questions did not by themselves constitute "suspicious circumstances." The court noted that the fact that the defendant was traveling in the middle of the night on a busy interstate highway cannot, by itself, create suspicious circumstances that can lead to an objectively reasonable suspicion that something is wrong. *Id.* at 1501. If such a factor were considered a suspicious circumstance, it would risk labeling all who travel on what some feel is an unusual hour as suspicious. *See id.* Nor could the Government successfully label the fact that drugs are found in vehicles or that the defendant was carrying one or two tool boxes, as suspicious circumstances by themselves. *Id.* Such a broad definition would, once again, brand all cargo or container carrying motorists who pass through permanent checkpoints on interstate highways as persons who need a bit more than just the routine border inquiry to explain "suspicious circumstances." *Id.* The court, however, found that all of these facts viewed together clearly indicated a few more questions to explain suspicious circumstances were in order.

In *United States v. Ludlow,* 992 F.2d 260 (10th Cir.1993), the court held that there were "suspicious circumstances" sufficient to justify further questioning of the defendant. In that case, the defendant was stopped at the primary area of a permanent checkpoint and questioned for about 45 seconds with respect to his citizenship and the ownership of the vehicle. *See id.* at 265. The defendant's vehicle had a Texas license plate. During the questioning, the Border Patrol agent noticed that the defendant did not roll down his window all the way. *Id.* at 264.

When the agent asked defendant to lower the window further so he could speak with him and be heard, defendant lowered the window further but did not lower it completely. *Id.* at 262. The agent was suspicious [of this conduct] because it was not cold and on prior occasions he had encountered motorists who avoided rolling down windows to prevent Border Patrol agents from smelling contraband within the vehicle. *Id.* The defendant was perspiring under the nose and he was looking all around. *Id.* at 264. He was generally nervous and he could not find the car registration. *Id.* Upon questioning, defendant informed the agent that the car belonged to a friend. The agent also noticed the driver had three suitcases in the car and was informed by defendant that they were his.[5] *Id.* at 261. Following the defendant's referral to the secondary checkpoint, defendant consented to a search of his suitcases. Less than two minutes had elapsed between the time the defendant entered the primary checkpoint to the time he consented to a search of the vehicle. *See id.* at 265 n. 6. The court found that in light of the defendant's demeanor and appearance, the circumstances justified the agent's conclusion that "suspicious circumstances" existed which would have warranted further detention and questioning as part of a routine inquiry. *Id.* at 265. The court in *Ludlow* also found that these circumstances alternatively gave rise to "reasonable suspicion." *Id.*

Under the facts of this case, and pursuant to *Martinez–Fuerte, Sanders,* and *Ludlow,* I find that Agent Holmes' conclusion that "suspicious circumstances" existed was not justified.

At 5:45 p.m. on March 11, 1994, Ms. Carrillo–Bernal, a Hispanic female, drove up to the I–10 United States Border Patrol permanent checkpoint, 20 miles west of Las Cruces in a 1982 Volkswagen Cabriolet convertible. Ms. Carrillo–Bernal's vehicle appeared to have a valid permanent Texas license plate bearing the number MRM–11V. The Border Patrol agent on duty, Mr. Randy Holmes, who had three years of experience as a Border Patrol

---

5. In this case, Agent Holmes contends that it was the *absence* of luggage in the passenger compartment that aroused his suspicion.

agent, noticed that the license plate was a Texas plate, but the appearance of the plate did not arouse his suspicions. When Agent Holmes asked Ms. Carrillo–Bernal to state her citizenship, she responded by showing the agent her resident alien card. Agent Holmes was satisfied that Ms. Carrillo–Bernal was legally entitled to live in the United States. There was nothing about her response to his question or the appearance of the resident alien card that aroused the agent's suspicions. Agent Holmes then asked Ms. Carrillo–Bernal where she was coming from and she responded that she was coming from El Paso, Texas, and going to California. Again, the agent found nothing suspicious about Ms. Carrillo–Bernal's response. He testified that it was not unusual for a person to drive from El Paso to California on I–10. Agent Holmes did not ask Ms. Carrillo–Bernal specifically where she was coming from in El Paso, nor did he ask her to reveal her specific destination in California. Agent Holmes never inquired how long she had been in El Paso or whether she lived in El Paso or California. Agent Holmes asked Ms. Carrillo–Bernal if she was the registered owner of the vehicle. She responded that the registered owner was José Moreno. Agent Holmes was apparently satisfied with Ms. Carrillo–Bernal's response because he at no time during the routine questioning asked to see the vehicle registration. Any follow-up questions with respect to the vehicle's registration would clearly have been within the scope of permissible inquiry. Agent Holmes, however, decided not to pursue this inquiry any further.

During the routine questioning of Ms. Carrillo–Bernal, it is undisputed that she did not appear to be nervous and she responded directly. Nothing about her demeanor, appearance, or the manner in which she responded to the agent's questions aroused the suspicions of the agent. In addition, the agent did not detect any odors that are commonly used to mask the smell of controlled substances and he did not observe that the car was heavily loaded.

There were only two facts the agent found to be suspicious: there was no luggage in the passenger compartment of the vehicle and the interior of the car was exceptionally clean. Based upon these "suspicious circumstances," Agent Holmes further detained Ms. Carrillo–Bernal to ask about the contents of her trunk. She responded that she had nothing in the trunk. The Court finds that this question exceeded the scope of limited inquiry permissible at permanent checkpoints as delineated in *Martinez–Fuerte* and subsequent Tenth Circuit decisions. The agent's justification for the additional inquiry was that "suspicious circumstances" warranted it. However, pursuant to *Sanders* and *Ludlow* this Court finds that the circumstances, here, do not support the agent's conclusion that "suspicious circumstances" existed justifying further detention.

■ This Court reads *Sanders* as mandating that the Court give "some deference," *id.* at 1500, to the agent's determination of "suspicious circumstances" with the caveat that law enforcement officers do not have absolute, unlimited discretion to invoke the term "suspicious circumstances" in order to subject a motorist to a "little more than just the routine border inquiry." *Id.* at 1501. Therefore, although this Court is cognizant that it must afford some deference to a law enforcement officer in determining what constitutes "suspicious circumstances," it also recognizes that the Court must not abdicate all responsibility in deferring to the law enforcement officer's judgment to such an extent that the officer is empowered to exercise unlimited discretion. Such unfettered discretion leads to the type of arbitrariness that is wholly incompatible with the Fourth Amendment's quintessential concern with the reasonableness of searches and seizures.[6] In *Sanders*, applying a totality of the circumstances approach in reviewing whether the Border Patrol agent's "perceived suspicious circum-

---

6. *See* Anthony Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 394–397 (1974). (In explaining the historical underpinnings of the Fourth Amendment, Amsterdam, quoting in part 2 L. Wroth & H. Zobel, Legal Papers of John Adams 141–42 (1965) states: The

power asserted by the English messengers and colonial customs officers and condemned by history was "a discretionary power ... to search wherever their suspicions may chance to fall," a power that places the liberty of every man in the hands of every petty officer." *Id.* at 396).

stances were supported by the facts," *id.* at 1500, the court determined that there were "suspicious circumstances" warranting further detention of the defendant.

The facts in this case are distinguishable from those in *Sanders* and when viewed in the aggregate, unlike the facts in *Sanders,* are neutral. Of particular significance in this case is Agent Holmes' failure to explain why it was so "suspicious" to travel without luggage in the passenger compartment of a vehicle which has a trunk or why it was so suspicious that the interior of the vehicle was clean. The only testimony presented was the officer's conclusory statement that it was unusual for an individual to travel without some kind of luggage in the passenger compartment of the vehicle. There was no testimony as to the percentage of motorists who do not carry luggage in the passenger compartment of their vehicles. There was no testimony as to what proportion of these motorists, upon inspection, had been discovered carrying illegal contraband in their vehicles. Agent Holmes provided the Court with no basis for objectively evaluating his conclusion that the lack of luggage in the passenger compartment of a vehicle was unusual, much less suspicious or indicative, in any way, of criminal conduct.

By contrast, in *Sanders,* the Border Patrol agent testified that he had never before seen a pickup containing more than one of the type of tool boxes that defendant was carrying in his pickup. In addition, the agent testified that he had formerly found illegal narcotic drugs in tool boxes similar to the ones that the defendant was carrying. In the absence of evidence substantiating Agent Holmes' conclusion that the lack of luggage in the passenger compartment of a car was suspicious, justifying further inquiry, the Court cannot find that such a circumstance constitutes a "suspicious circumstance" justifying detention beyond the routine inquiry as to citizenship, immigration status, vehicle ownership and registration, cargo, destination, and travel plans. If such a factor were considered a "suspicious circumstance," it would risk labeling all who travel with luggage in the trunk instead of in the passenger compartment of a car as suspicious persons

who need "a bit more than just the routine border inquiry to explain suspicious circumstances." *Id.* at 1501.

Likewise, the fact that Ms. Carrillo–Bernal's vehicle was clean does not constitute a "suspicious circumstance" warranting further detention. In fact, when viewed together with the absence of luggage in the passenger compartment of the car, it is consistent with a person who is extremely neat and tidy and who likes to keep things in their proper place, i.e., keeping luggage in the trunk of a car. When viewed in the aggregate, these factors do not merit his conclusion that suspicious circumstances existed to warrant further detention. This is so, particularly in light of all the other factors that were present: The seizure took place at 5:45 p.m.; the vehicle's license plate appeared to be a permanent license plate and its appearance did not raise the suspicions of the agent; Ms. Carrillo–Bernal was not nervous, she responded to the agent's questions in such a way that did not raise the agent's suspicions; she was not evasive; her demeanor during questioning did not raise the agent's suspicions; there were no masking odors emanating from the vehicle; the vehicle did not appear to be heavily loaded; when asked if she was the registered owner of the vehicle she responded that the registered owner was José Moreno; the manner in which she responded to the previous question did not raise the agent's suspicions as evidenced by the fact that Agent Holmes asked no further questions about registration. To find that "suspicious circumstances" existed in this case, is to label any motorist who travels from El Paso to California at 5:45 in the afternoon and who does not have luggage in the passenger compartment of the vehicle, and who happens to keep the interior of their vehicle clean, as "suspicious" and who, therefore, needs "a bit more than just the routine border inquiry." *See id.* at 1501.

The agent testified that it "crossed [his] mind" that the car might be stolen. This statement is, however, inconsistent with the agent's acts. He did not inquire further of Ms. Carrillo–Bernal as to the car's registration when she told him that José Moreno was the registered owner. He did not request to

see proof of registration and he did not run a registration check of the vehicle until *after* Ms. Carrillo–Bernal had been arrested. The Court did not find this statement to be credible. The only basis for the question as to the contents of defendant's trunk was the fact that Agent Holmes perceived as a "suspicious circumstance" the absence of luggage in the passenger compartment of a very clean vehicle. Agent Holmes stated on cross-examination that he would have directed defendant over to the secondary inspection area to do a K–9 search of defendant's vehicle even if there had been luggage in the trunk. This admission reveals that the presence or absence of luggage was not, in reality, of great concern to the agent so as to justify further detention of the defendant. Rather, it reveals that Agent Holmes' continued detention of defendant was based on a mere hunch that she was transporting drugs.

*United States v. Ludlow* is also distinguishable from this case. In that case, the totality of the circumstances indicated "suspicious circumstances" justifying the continued detention of the defendant. In stark contrast to all the facts relied upon by the Border Patrol agent in *Ludlow,* in this case Agent Holmes relied only upon the lack of luggage in the passenger compartment of a very clean car. One of the many factors that the agent in *Ludlow* relied upon in further detaining the defendant was that defendant did not roll the window all the way down. This was significant to the agent because he had personally encountered motorists who had avoided rolling down windows in order to prevent Border Patrol agents from smelling contraband within the vehicle. In short, unlike in *Ludlow,* the "whole picture" in this case is a neutral one. *United States v. Johnson,* 895 F.2d 693, 696 (10th Cir.1990), *citing*

United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981).

Since the "principal protection of the Fourth Amendment at checkpoint stops lies in the appropriate limitations on the scope of the stop," *Martinez–Fuerte,* 428 U.S. at 567, 96 S.Ct. at 3087, it is essential that once the courts have delineated the scope of the stop, that they be vigilant to circumstances where continued detention exceeds this carefully limited scope. Courts must be ever vigilant lest the Fourth Amendment's prohibition of unreasonable searches and seizures be rendered meaningless at permanent checkpoints. In this case, the Court finds that Agent Holmes exceeded the limited scope of inquiry absent reasonable suspicion, probable cause or consent. Looking at the totality of the circumstances, the facts in this case do not support the agent's conclusions that "suspicious circumstances" existed. The agent exceeded the scope of permissible inquiry when he inquired as to the contents of defendant's trunk. The facts, at this point in the detention, did not justify his conclusion that "suspicious circumstances" existed warranting further detention. After receiving satisfactory answers with respect to the routine questions, upon observing defendant's composed demeanor, and observing an apparently legitimate permanent license plate, the agent should have sent defendant on her way.[7] Instead, he relied on a mere hunch, not supported by his law enforcement experience, or based on any objective facts that support his conclusion of "suspicious circumstances" when he decided to further detain defendant to inquire about the contents of her trunk. Since the agent's illegal detention led to the subsequent search of defendant's car, all evidence found as a result of that search must be suppressed. *Wong Sun v.*

---

7. *Cf. United States v. Espinosa,* 782 F.2d 888, 890 (10th Cir.1986) (suspicious circumstances existed: where defendant drove a car which had a temporary Florida license plate in the rear window; where defendant and the passenger in the car would hesitate and look at each other before answering the Border Patrol agent's questions; and where defendant stated he had been on vacation in Florida and the passenger stated he was going to California to look for work, but very little luggage was observed in the car).

*Cf. United States v. Rascon–Ortiz,* 994 F.2d 749, 750 (10th Cir.1993) (suspicious circumstances existed where Border Patrol agent noticed that both the driver and passenger were "shaking like leaves in the wind." The defendants' hands were visibly shaking when they showed the agent their alien registration card and Mexican passport respectively).

*United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ Further, since the connection between defendant's statement to Special Agent Cox and the illegal detention was not so attenuated as to dissipate the taint of the illegal detention, defendant's statement to Special Agent Cox must also be suppressed. *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *see also United States v. Recalde,* 761 F.2d 1448 (10th Cir. 1985); *see also United States v. Maez,* 872 F.2d 1444 (10th Cir.1989); *Cf. Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

IT IS THEREFORE ORDERED that defendant's motion to suppress is GRANTED.